In the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST Ronald A. ARTHUR, Attorney at Law:

OFFICE OF LAWYER REGULATION f/k/a Board of Attorneys Professional Responsibility, Complainant,

v.

Ronald A. ARTHUR, Respondent.

Supreme Court

*No. 2001AP1914–D. Oral argument October 6, 2004.—Decided April 15, 2005.*

2005 WI 40

(Also reported in 694 N.W.2d 910.)

584

For the respondent there were briefs by *Ronald A. Arthur,* Lake Geneva, and oral argument by *Ronald A. Arthur.*

For the complainant there was a brief by *James C. Reiher* and *Domnitz, Mawicke & Goisman, S.C.,* Milwaukee, and oral argument by *James C. Reiher.*

¶ 1. PER CURIAM. Attorney Ronald A. Arthur seeks review of a referee's report and recommendation, recommending revocation of his license to practice law in Wisconsin, and recommending further that Arthur be required to pay the costs of this disciplinary proceeding, which are substantial.

¶ 2. Arthur challenges the referee's findings and conclusions and urges the court to: (1) reject the referee's report in its entirety; (2) dismiss all allegations

in the Office of Lawyer Regulation's (OLR) complaint; (3) accept Arthur's voluntary resignation from the State Bar of Wisconsin; (4) order the OLR to reimburse Arthur for his legal fees and expenses; (5) vacate a decision of the Juneau County Circuit Court; (6) issue an order enjoining the grievants from ever asserting another claim against him; and (7) direct the OLR and Judicial Commission to take appropriate disciplinary action against the other parties to this litigation.

¶ 3. We determine that the referee's findings of facts are not clearly erroneous. *See In re Disciplinary Proceedings Against Sosnay,* 209 Wis. 2d 241, 243, 562 N.W.2d 137 (1997). Those findings were supported by the clear, satisfactory, and convincing evidence presented at the public hearing held in this disciplinary matter and reflected in the record. After our de novo review of the referee's conclusions of law, *see In re Disciplinary Proceedings Against Carroll,* 2001 WI 130, ¶ 29, 248 Wis. 2d 662, 636 N.W.2d 718, we agree with the referee that the extensive pattern of misconduct found by the referee reflects serious, widespread, and repeated violations of the Rules of Attorneys Professional Responsibility, warranting the revocation of Arthur's license to practice law in Wisconsin.

¶ 4. Accordingly, we reject Arthur's requests, adopt the referee's findings of fact and conclusions of law, and revoke Arthur's license to practice law in Wisconsin. We further agree with the referee that Arthur should be required to pay to the OLR all the costs connected with this disciplinary proceeding totaling $145,548.73 as of the date of the final statement of costs filed on October 19, 2004.

¶ 5. Arthur was admitted to practice in Wisconsin in 1982. He has no significant disciplinary history. His license to practice law in Wisconsin is currently suspended for failure to comply with continuing education requirements.

¶ 6. In December 1995, William ("Jack") Keefe filed a grievance against Arthur through the (former) Board of Attorneys Professional Responsibility (BAPR). The allegations derived from a failed business venture involving Keefe and his adult son, Randy Keefe (the "Keefes"), Arthur, as the Keefes' attorney and business advisor, and Arthur's wife, Mary Kathleen Arthur, also an attorney.[1] The matter also implicated allegations of damage done to property in Juneau County owned by Barbara Doyle. These events will be discussed in a chronological sequence.

¶ 7. A lengthy disciplinary investigation ensued. On July 13, 2001, the BAPR's successor, the OLR, filed a complaint against Arthur alleging six counts of misconduct, and recommending revocation of Arthur's license to practice law.

¶ 8. On October 14, 2003, following extensive pre-hearing proceedings, admission of thousands of pages of documentary evidence, 22 days of hearings, and post-hearing proceedings, the referee filed a report and recommendation, recommending revocation of Arthur's license to practice law. Arthur sought review.

¶ 9. A discussion of the incidents giving rise to this disciplinary proceeding is unavoidable. These inci-

[1] Attorney Mary Kathleen Arthur stipulated to a 90–day suspension for her misconduct in proceedings related to some of the allegations herein. *See In re Disciplinary Proceedings Against Arthur,* 2004 WI 66, 272 Wis. 2d 252, 680 N.W.2d 758.

dents have been the subject of several lawsuits by various individuals and entities, in various courts. In some cases, different courts have made differing factual findings, depending on the cause of action presented or procedural posture of the matter. However, we are mindful that our task today is not to review the decisions of other courts that are not before us on appeal, or to permit "re-litigation" of old grievances. To that end, certain details we deem not relevant to the issues before us will be omitted. Our task is to review Arthur's challenge to the referee's report and recommendation. The court will adopt the referee's findings of fact unless they are "clearly erroneous." *In re Disciplinary Proceedings Against Swartwout,* 116 Wis. 2d 380, 382, 342 N.W.2d 406 (1984). We will review the referee's conclusions of law de novo. *In re Disciplinary Proceedings Against Hetzel,* 118 Wis. 2d 257, 259, 346 N.W.2d 782 (1984).

¶ 10. In August 1992, Randy Keefe retained Arthur to represent him in a pending action, unrelated to the present disciplinary action, in which Keefe had previously appeared pro se. Arthur worked on the matter until approximately February 1994, when the action was dismissed. He also represented the Keefes in "certain other small legal matters" from approximately August 1992 to August 1994. Arthur was not the only lawyer the Keefes worked with. Other counsel represented the Keefes in various other matters, including bankruptcy and divorce proceedings. The Keefes and Arthur dispute whether Arthur continued to represent the Keefes from the fall of 1994 through spring of 1995.

¶ 11. In any event, early in 1994, Randy Keefe and Arthur discussed a possible business arrangement whereby Arthur would purchase parcels of wooded

land, and a corporation owned by the Keefes would harvest the marketable timber and pay Arthur a higher price for the timber than other loggers would. The anticipated benefit to the Keefes was that their corporation would not have to pay Arthur for the timber up front; Arthur would be paid from the proceeds received from the sale of the harvested timber.

¶ 12. From approximately June to November 1994, Arthur purchased four parcels of wooded land in southwestern Wisconsin. The parties entered into four separate Timber Purchase and Sale Agreements to harvest timber on those sites. Each of these agreements was by and among Ronald Arthur and Halco Financial and Realty Corporation[2] d/b/a Forest Hills Reserve, Ltd., and Statewide Log and Lumber Co., Inc. ("Statewide").[3] Randy Keefe, on behalf of Statewide, and Arthur signed each of the four contracts. Each contract identified Statewide as the purchaser of the timber. The parties dispute whether Arthur provided legal services to Statewide. Arthur notes that he did not prepare the articles of incorporation for this entity. He acknowledges that he "attempted to find a source for certain financing that the Keefes were seeking [for Statewide]," but maintains that he and the Keefes viewed financial advice as separate and distinct from the rendering of legal advice. In subsequent litigation, evidence was

---

[2] Arthur was president and legal counsel to Halco Financial and Realty Corporation (HALCO), an entity created and incorporated by Arthur, and owned by Mary Kathleen Arthur, as custodian for the Arthurs' then minor child. HALCO was a business involved in real estate development.

[3] Statewide was formed in March 1993, with Randy Keefe as its president. Statewide was owned by Ivan Schairer, a man who apparently financed business ventures for the Keefes.

591

produced that reflected Arthur did submit a bill for legal services he purported to have rendered for Statewide.

¶ 13. Logging operations on the four parcels commenced in the summer of 1994. Progress on one of the parcels, referred to as the "Viroqua" parcel, was apparently slow. By the late fall of 1994, it is apparent from all versions of events, that the relationship between the Keefes and Arthur was deteriorating.

¶ 14. Arthur avers that the Keefes did not pay him for the timber they harvested, and that he lost some $50,000 as a result. The Keefes testified that Arthur tried to "coerce" them into accepting a $150,000 loan, and testified that they believed the money was part of an illegal Russian money laundering operation. They later testified that they felt threatened by Arthur.

¶ 15. The record reflects conflicting testimony about the state of the business venture in January 1995. About this time Arthur sent a letter to Tri-City National Bank seeking financing for a "Joint Venture Business Plan" between HALCO and Statewide. However, this plan was not financed. As such, this proposed "joint venture" did not materialize.

¶ 16. Around the same time, the Keefes testified that they had a meeting with Arthur in which they expressed their desire to restructure the agreements to relieve Statewide of its obligations under the timber contracts. It is suggested that their financier wanted out of the deal.[4]

---

[4] It appears that the decision to physically alter the contracts to replace the name Statewide with "Keefes" occurred around this time. The Keefes testified Arthur was aware of this decision and acceded to it; Arthur disputes this.

¶ 17. On or about January 23, 1995, Arthur sent a letter to the Keefes in connection with an offer to purchase, advising them for the first time that they should seek independent legal counsel or sign a waiver pursuant to SCR 20:1.8. The Keefes did not execute either document.

¶ 18. Meanwhile, Arthur independently entered a business relationship with Thomas Zupfer, a logger hired by Arthur or HALCO, to pursue logging on the parcels. Arthur alleges that Randy Keefe "caused State-wide" to stop harvesting timber at the Viroqua site and moved the logging operations to another parcel owned by Arthur in Juneau County. The Juneau County parcel owned by Arthur was adjacent to a four-acre parcel owned by Barbara Doyle.

¶ 19. At some point in early 1995, Ms. Doyle discovered that a logging road had been cut across the corner of her property, without her permission. Ms. Doyle felt the aesthetic damage to her property was significant. This incident was the origin of a separate dispute between Ms. Doyle and Arthur, which eventually culminated in litigation implicated in this disciplinary action.

¶ 20. Meanwhile, in the spring of 1995, the Keefes removed "hundreds of logs" from Arthur's parcel of property located in Lyndon Station and transferred them for storage on the Keefes' property in Endeavor, Wisconsin ("Endeavor property"). The parties vigorously dispute the Keefes' authority to remove the logs.

¶ 21. On April 18, 1995, the Keefes delivered a letter to Arthur, terminating the business and attorney-client relationship with Arthur. The referee found that on the same day, Arthur acknowledged the termination, and directed the Keefes to stop logging and to make an accounting of the logs stored on the Endeavor property.

The referee also found that Arthur submitted a settlement proposal to the Keefes and directed them to find and consult a lawyer, all while transferring his interest in the logs at the Endeavor property to Thomas Zupfer's company, Zupfer Timber Corporation International ("Zupfer Timber").

¶ 22. On April 24, 1995, Attorney Mary Kathleen Arthur, on behalf of Arthur, HALCO, and Zupfer Timber, filed a summons, complaint and ex parte motion for temporary injunction against the Keefes seeking to remove the logs on the Endeavor property. The motion was denied; Attorney Mary Kathleen Arthur dismissed the action.

¶ 23. On April 25, 1995, Arthur, together with a deputy from the Marquette County Sheriff's Department, went to the Endeavor property to "recover" logs taken from the Lyndon Station and Viroqua properties. No court order was in effect at this time. Randy Keefe was arrested during this incident, purportedly for, inter alia, preventing the removal of the logs.

¶ 24. Later that same day, Arthur commenced a second action and obtained a temporary injunction giving him control of the logs, including those he had seized from the Keefes. Randy Keefe was served with a copy of this order after the logs had been removed. A series of lawsuits arose as a result of these incidents. Our discussion of the litigation that arose as a result of these incidents is, in keeping with our objective of avoiding "re-litigation" of settled matters, somewhat abbreviated.

¶ 25. Returning to the incident involving Ms. Doyle's property, some correspondence between Arthur and Ms. Doyle's attorney, Eli Schmukler, ensued, in-

cluding a statement by Arthur, warning Attorney Schmukler that Ms. Doyle "might find the litigation process unpleasant."

¶ 26. On August 31, 1995, Arthur commenced a lawsuit in Dodge County, alleging numerous contract and tort claims against the Keefes and Statewide still related to their business dispute, but also seeking a declaratory judgment that neither Arthur nor HALCO were liable for the trespass to Ms. Doyle's property ("Dodge County lawsuit"). Eleven days later, Ms. Doyle sued Arthur in trespass, filing the action in Juneau County where she lived on the property in question.

¶ 27. In response to Arthur's Dodge County lawsuit, the Keefes asked the court to transfer the matter to Marquette County, where another case filed against them by Arthur was pending.

¶ 28. Meanwhile, correspondence between Attorney Schmukler and Arthur was increasingly acrimonious. Arthur informed Attorney Schmukler that his wife, Mary Kathleen Arthur, was a former district attorney for Dodge County. Attorney Schmukler later asserted that he believed this statement was intended to intimidate him in the context of the pending litigation in Dodge County. He also avers that Arthur stated he would sue Attorney Schmukler, personally, for abuse of process and conspiracy if the action Ms. Doyle had commenced in Juneau County was not dismissed.

¶ 29. On or about December 11, 1995, Arthur filed a severed complaint in the Dodge County action, alleging that Ms. Doyle and the Keefes had acted in concert to defame and otherwise injure him. Ms. Doyle moved to strike that complaint.

¶ 30. In February 1996, the Dodge County Circuit Court transferred venue of Arthur's claims against the Keefes to Marquette County, and dismissed Arthur's

declaratory judgment claim against Ms. Doyle. The court also transferred Arthur's conspiracy claims and Doyle's motion to dismiss those claims, to Juneau County.

¶ 31. Throughout late 1995 and well into 1996, Arthur filed numerous sets of interrogatories, requests for admission, and requests for production of documents in these matters. Apparently, several of those requests went unanswered by the Keefes, who were still proceeding pro se. Arthur then filed a motion contending the Keefes had engaged in discovery violations and seeking sanctions.

¶ 32. Eventually, the Dodge and Marquette County cases were consolidated, and the Keefes filed additional counterclaims. Additional motions followed. On May 1, 1998, the circuit court ruled that the Keefes were in default for failing to appear at a pretrial conference and dismissed all of their claims.

¶ 33. The matter went to trial on Arthur's claims. The trial court ultimately dismissed Arthur's claims against the Keefes on the grounds that Arthur had misused his attorney-client relationship with the Keefes by engaging in a business relationship without advising them of a conflict of interest, instead seeking to protect his own self-interest.

¶ 34. Meanwhile, Arthur effectively failed to file a necessary pleading in the case pending in Juneau County Circuit Court; Ms. Doyle was granted a default judgment. The court later denied Arthur's motion to set aside the default judgment, and ordered a hearing on the amount of damages to which Ms. Doyle was entitled.

¶ 35. In a memorandum decision dated July 31, 1997, the Juneau County Circuit Court found that Arthur "intentionally and maliciously used his and his

wife's position and knowledge as attorneys in an all out effort to intimidate [Ms.] Doyle . . . ." In addition, the circuit court found that Arthur had threatened to sue Ms. Doyle and her attorneys for conspiracy and extortion without any factual basis for such a complaint. Ms. Doyle was eventually awarded $34,720 in compensatory damages and $75,000 in punitive damages. To date, this judgment remains unsatisfied.[5]

¶ 36. The Juneau County court also dismissed Arthur's "severed complaint" as untimely, and deemed Arthur's amended complaint "incomprehensible." The court expressly added that Arthur could refile the complaint.

¶ 37. Arthur opted to appeal. The court of appeals affirmed the circuit court decision, concluding "Arthur's claim that the trial court 'disregarded' this action while it proceeded with Doyle's case is without support in the record." *Arthur v. Keefe,* No. 98–1897, unpublished slip op. at 1 (Wis. Ct. App. Nov. 4, 1999).

¶ 38. Having been assessed punitive damages in the Juneau County case, Arthur proceeded to file an action seeking indemnification from his legal malpractice carrier. He also filed a cross-claim against Ms. Doyle in this action, naming Ms. Doyle's attorneys as third-party defendants, and, despite the circuit court's previous findings, alleging that Ms. Doyle and her attorneys

---

[5] Arthur spends a good portion of his brief to this court challenging this decision and challenging the extent to which it formed the basis for some of the referee's factual findings. Indeed, he asserts that the real question for this court is whether a lawyer can be disbarred "based upon putative facts that have been deemed into existence by a circuit court judge, even though said deemed facts are in conflict with real facts that can be readily ascertained."

had engaged in conspiracy and extortion against him. This action was later dismissed.

¶ 39. A number of other legal proceedings arose as a result of these incidents as well. With competing actions in Dodge, Marquette, Juneau, Milwaukee and Adams Counties, not to mention federal and bankruptcy court proceedings, the "civil procedure aspects of the litigation" were, to quote the Marquette County Circuit Court, "a mess."

¶ 40. The disciplinary complaint ultimately filed against Arthur alleged six counts of professional misconduct. These will be addressed seriatim.

### COUNT I: SCR 20:1.8(a)

¶ 41. The disciplinary complaint alleged that Arthur violated SCR 20:1.8(a), which provides:

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) the client consents in writing thereto.

¶ 42. The question for this court is whether the OLR demonstrated by clear and convincing evidence that Arthur violated SCR 20:1.8(a). The referee con-

cluded that it had, finding, inter alia, that Arthur and the Keefes were involved in a "series of complex business transactions . . . while [Arthur] was representing them as their attorney between 1992 and 1995." Referencing the four separate Timber Purchase and Sale Agreements, the referee found that Arthur "failed to obtain any written waivers from the Keefes and/or Statewide consenting to his legal representation notwithstanding the conflicts of interest in his personal business dealings with the Keefes . . . ."

¶ 43. Arthur challenges the referee's findings and conclusion. He contends he never entered into a "business transaction" with the Keefes as that term is used in SCR 20:1.8(a). Arthur acknowledges that he entered a "logging contract" with Statewide, but essentially asserts that a transaction with the entity, Statewide, is not the same as a business transaction with the Keefes. He points out that the proposed joint venture with the Keefes was never formalized, noting that the financing proposal submitted to Tri-City was never approved. He contends that Attorney Schmukler committed misconduct by suggesting otherwise in the Juneau County proceedings.[6]

¶ 44. We consider the comment to SCR 20:1.8, which indicates that this rule "does not, however, apply to standard commercial transactions between the lawyer and the client for products or services that the client generally markets to others, for example, banking or brokerage services, medical services, products manufac-

---

[6] Specifically, Arthur maintains that Attorney Schmukler engaged in misconduct, misleading the court, when he attached a copy of one of the logging contracts between Statewide and HALCO, on which the name "Statewide" had been crossed out and the Keefes' names handwritten in, together with a copy of the unexecuted "joint venture" financing plan.

tured or distributed by the client, and utilities services." The comment states further: "In such transactions, the lawyer has no advantage in dealing with the client, and the restrictions in paragraph (a) are unnecessary and impracticable."

¶ 45. However, the referee explicitly found that "[t]hese were not standard commercial transactions." Although Arthur disparages the referee's understanding in his effort to persuade us that these were in fact run-of-the-mill transactions in which he was actually at the mercy of the Keefes' superior knowledge of logging operations, we are not persuaded that the referee's finding on this point is clearly erroneous.

¶ 46. Arthur has not identified sufficient record evidence that the logging operations conducted by Statewide were demonstrably of the sort that Statewide generally marketed to others. More significantly, while we appreciate the distinction Arthur draws between the Keefes, as individuals, and Statewide, as a discrete entity owned by Ivan Schairer, in this matter we deem this a distinction without a difference. Here, Arthur started as a business associate and legal advisor to the Keefes, then proceeded to sue them in different venues when their business dealings went awry, without obtaining a waiver. SCR 20:1.8 clearly provides that a lawyer shall not "knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client" without satisfying the rule's written waiver requirements.

¶ 47. The first written documentation in which Arthur advises the Keefes of a conflict between the parties' interests was in a letter dated January 23, 1995. It is undisputed that the Keefes did not consent to or waive the conflict.

■

¶ 48. The waiver requirements of SCR 20:1.8 cannot be satisfied solely by a client signing the underlying loan documents, the terms of which are already required to be in writing under sub. (a)1. "[T]he client must give separate consent to the transaction with the lawyer, waiving the conflict of interest, and the client must indicate in writing he or she has been given a reasonable opportunity to consult with independent counsel." *In re Disciplinary Proceedings Against Trewin,* 2004 WI 116, ¶ 38, 275 Wis. 2d 116, 684 N.W.2d 121.

■

¶ 49. We conclude that there are sufficient facts of record to support the referee's findings of fact made in connection with this allegation, and we conclude that Arthur violated SCR 20:1.8(a) by engaging in business transactions in which the Keefes had a significant personal and financial interest, without having first obtained written waiver as required by SCR 20:1.8.

## COUNT II: SCR 20:3.1(a)(3)

¶ 50. We turn to the second count in the disciplinary complaint filed against Arthur. The disciplinary complaint alleged and the referee found that Arthur violated SCR 20:3.1(a)(3). which provides that, in representing a client, a lawyer shall not "file a suit, assert a position, conduct a defense, delay a trial or take other action on behalf of the client when the lawyer knows or when it is obvious that such an action would serve merely to harass or maliciously injure another."

¶ 51. Arthur levies several challenges to the referee's findings and conclusion. We will address the most significant of these arguments. The referee's extensive findings in relation to this court are summarized as follows:

Arthur told Attorney Schmukler that Ms. Doyle might find the litigation process "unpleasant."

Arthur and his wife, Attorney Mary Kathleen Arthur, sent a series of letters attempting to intimidate Attorney Schmukler, such as indicating that Mary Kathleen was a former district attorney in Dodge County, alleging conspiracy and abuse of process, and threatening to sue Attorney Schmukler personally if the Doyle action was not dismissed.

In response to Ms. Doyle's complaint, filing an amended complaint alleging Ms. Doyle acted in concert with the Keefes to defame or otherwise injure him.

Approving Attorney Mary Kathleen Arthur's filing of a petition for supervisory writ in the court of appeals, including the execution of affidavits accusing the judge of ulterior motives and bias without specific facts to support the claims.

Following the default judgment against him, filing an indemnification claim with his insurance carrier, impleading Ms. Doyle and her attorney, alleging they had maliciously conspired with the Keefes to harm him, notwithstanding previous rulings that they had not so conspired. *See Heritage Mutual Ins. Co. v. Arthur et al.,* 97 CV 9686.

Filing a complaint with the Department of Agriculture against the Keefes one day before Randy Keefe was scheduled to testify in the disciplinary matter.

Other examples of harassing litigation tactics employed by Arthur in other cases, such as suing judges and opposing counsel in various actions in order to harass or induce them to withdraw from cases, in one instance commenting that he had an attorney "by the nuts" and was going to "jerk them for the next five years" by filing an action unless they agreed to his terms.

¶ 52. Arthur suggests that any findings made in connection with the Juneau County lawsuit should be considered void based on his contention Attorney Schmukler committed misconduct by submitting certain documents to the court. With respect to the specific comment made to Attorney Schmukler that Ms. Doyle might find the litigation process "unpleasant," Arthur defends this statement and expresses incredulity that he would be disciplined for what he deems to be his effort to take the "moral high-ground." He suggests "the Referee's Report seems to assert that it constitutes professional misconduct for a lawyer to indicate in writing that he or she even intends to abide by SCR 20:8.3." Similarly, he disputes that he intended to "intimidate" opposing counsel.

¶ 53. The referee obviously found otherwise. Discerning the "intent" behind an attorney's statement to opposing counsel frequently requires a credibility determination by the referee. Here, Arthur did not persuade the referee that the Juneau County default judgment should be wholly ignored because of Attorney Schmukler's conduct, or that his own comments to Attorney Schmukler were made in good faith. Nor, apparently, did he persuade the referee that the Keefes were wholly lacking in credibility, or that he, himself, was entitled to much credibility. It is well settled that where there is conflicting testimony, the referee, as finder of fact, is the ultimate arbiter of the credibility of the witnesses. See, e.g., Swartwout, 116 Wis. 2d 380; Cogswell v. Robertshaw Controls Co., 87 Wis. 2d 243, 274 N.W.2d 647 (1979). We will not disturb the referee's credibility determinations here.

¶ 54. Arthur generally defends his litigation style and strategy. He blames the Keefes, who certainly

contributed to the extent of the litigation. Arthur also challenges the referee's findings regarding his conduct in litigation not mentioned in the disciplinary complaint. He asserts that he had inadequate notice of these allegations, and suggests this implicates his due process rights. While the complaint contains specific allegations regarding the transactions and litigation among the Keefes and Ms. Doyle, it is true that the complaint does not reference allegations of Arthur's conduct in other court proceedings.

¶ 55. The referee made findings that Arthur has engaged in a pattern of harassing conduct for more than a decade, finding, specifically, that Arthur has sued opposing counsel and judges in various matters, and has threatened to file disciplinary grievances against lawyers and judges in other matters; noted other trial courts have found such tactics to be "frivolous, commenced, used, and continued in bad faith and solely for the purpose of harassing or maliciously injuring another." The referee also made reference to statements by several judges that Arthur was not credible.[7]

¶ 56. We conclude that there is no need for this court to decide whether there was sufficient notice of the findings regarding Arthur's misuse of the litigation process beyond the Doyle and Keefe matters, because these findings are not necessary to sustain a conclusion that Arthur violated SCR 20:3.1(a).

---

[7] For example, during a June 1998 trial proceeding, the Honorable Richard Wright said "the court just can't buy your testimony . . . . [I]t is a conflict of interest because you have a stake in that . . . business deal . . . . [Y]ou did not make sure your clients have this protection as an attorney who wasn't self-dealing. . . . Instead of taking steps to protect them, you took steps to protect yourself, including litigation."

## COUNT III: SCR 20:3.2

¶ 57. We turn to the third count alleged in the disciplinary complaint. The disciplinary complaint alleged that Arthur violated SCR 20:3.2, which provides: "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client." The referee found that Arthur "undertook numerous efforts to unreasonably delay and impede the course of litigation and needlessly increase the cost related thereto." The referee identified five specific examples of Arthur's duplicative litigation, failure to comply with discovery requests, or other conduct that frustrated the discovery process.

¶ 58. Arthur challenges the referee's findings and conclusion. He asserts, again, that the Keefes engaged in similar litigation tactics and seeks to justify his extensive discovery filings in this disciplinary matter, explaining that he was attempting to "pin down [the] OLR's allegations and/or limit the scope of the proceedings." However, it is not these discovery tactics for which he is being disciplined.

¶ 59. We are mindful that the situation before the court is somewhat unusual in that Arthur or his wife, Attorney Mary Kathleen Arthur, were acting as counsel on behalf of the Arthurs' own business interests—albeit interests adverse to Ronald Arthur's former clients.

¶ 60. As there is little case law directly on point we are guided in part by the comment to this rule, which recognizes that dilatory practices bring the administration of justice into disrepute.

> Delay should not be indulged merely for the convenience of the advocates, or for the purpose of frustrating an opposing party's attempt to obtain rightful redress or repose. It is not a justification that similar

conduct is often tolerated by the bench and bar. The question is whether a competent lawyer acting in good faith would regard the course of action as having some substantial purpose other than delay. Realizing financial or other benefit from otherwise improper delay in litigation is not a legitimate interest of the client.

SCR 20:3.2 cmt.

■

¶ 61. Notwithstanding Arthur's protestations, the record reflects numerous examples of duplicative or excessive litigation, such as the fact that the Juneau County Circuit Court deemed Arthur's amended complaint "incomprehensible" and as the Marquette County Circuit Court noted, "one of the lengthiest and most difficult [complaints] to follow . . . that [this Court] had ever reviewed." This observation is not dependent on the underlying facts of record, however disputed. We are not persuaded that the referee's findings of fact are clearly erroneous and we have little difficulty concluding that the record contains clear and convincing evidence that Arthur violated SCR 20:3.2.

### COUNT IV: SCR 20:3.3(a)(1)

¶ 62. The referee also concluded that Arthur violated SCR 20:3.3(a)(1), which provides that a lawyer shall not knowingly "make a false statement of fact or law to a tribunal." Here, the referee found that Arthur made "numerous" false statements to a tribunal, including the following, which are distilled from the referee's findings of fact:

> The Juneau County Circuit Court, the Honorable John Brady presiding, found that Arthur "falsely testified that, in the latter part of 1994, his relationship with the Keefes became adversarial." The referee noted

606

that this statement was contradicted by a letter dated January 4, 1995 from Arthur to Tri-City National Bank in which he sought financing for himself and Statewide and asserted that he had a "good relationship" with the Keefes.

The Juneau County court found that Arthur falsely testified that he could not remember the specific nature of HALCO's activities, notwithstanding the fact that Arthur's wife owned HALCO, for the benefit of their minor child, and that he served as its president and acted as its attorney for many years.

The Juneau County court found that Arthur falsely testified on May 16, 1997, that he was insolvent and owed $100,000 when on December 31, 1996, he submitted a statement of net worth to Tri-City National Bank that indicated he and his wife's net worth exceeded $500,000. When questioned how he had lost $600,000 in five months, he attributed it to the litigation with the Keefes and Ms. Doyle, despite the fact he and his wife were representing themselves.

The Juneau County court found that Arthur falsely testified about the property lines on Ms. Doyle's property.

¶ 63. Arthur vigorously challenges these findings. He emphasizes that the Juneau County Circuit Court order was on a default judgment, suggesting that the court simply took the facts alleged in the complaint, and adopted them without further scrutiny. He claims, further, that the judges quoted by the referee lacked "personal knowledge" of the circumstances. He is aggrieved that the referee adopted almost none of his proposed findings of fact, but accepted the OLR's proposed findings almost verbatim.

¶ 64. We are not persuaded that the reliance on statements by the circuit court should be disregarded. A

number of these findings were based, for example, on the court's consideration of Arthur's own testimony, which it characterized as "evasive, inaccurate and unworthy of belief."

¶ 65. Arthur also specifically challenges the referee's findings regarding his representation of the relationship with the Keefes, noting that the Keefes had also testified that the relationship was adversarial by fall of 1994. He challenges the finding regarding HALCO, noting that he did describe some of the company's activities.

¶ 66. We are not persuaded that the referee's findings of fact made in connection with this count can be deemed clearly erroneous. The record in this disciplinary proceeding includes more than six boxes of documents, and, as already noted, there have been multiple actions filed in connection with the underlying disputes. Inconsistencies in testimony are inevitable, from all parties, including Arthur. Moreover, as the situation involving Arthur's financial circumstances exemplifies, "[t]here are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation." SCR 20:3.3(a)(1) cmt. (Representation by a Lawyer). Even if we disregard the two findings Arthur specifically challenges in ¶ 65 of this decision, there is still sufficient record evidence to sustain the referee's conclusion that Arthur made false statements before a tribunal in violation of SCR 20:3.3(a)(1).

COUNT V: SCR 20:3.4(b)

¶ 67. The disciplinary complaint alleged that Arthur violated SCR 20:3.4(b), which provides that a lawyer shall not "falsify evidence, counsel or assist a

608

witness to testify falsely, or offer an inducement to a witness that is prohibited by law."

¶ 68. This allegation stems from Thomas Zupfer's claim that Arthur instructed him to lie about an illness in order to avoid appearing at a properly noticed deposition. As previously noted, Zupfer was the log buyer and timber broker that Arthur engaged in 1995, around the time he was parting company with State-wide and the Keefes.

¶ 69. During these disciplinary proceedings, Zupfer testified that Arthur was his lawyer and that Arthur had told him to call in sick on December 4, 1995, to avoid having to attend a deposition. Arthur vigorously disputes this charge. He challenges the existence of an attorney-client relationship between the two, noting that Zupfer earlier denied having an attorney-client relationship with Arthur. He asserts, further, that Zupfer "was not a credible witness."

¶ 70. This finding turned almost exclusively on the referee's credibility assessment. The referee noted that Mary Kathleen Arthur appeared as counsel of record for Zupfer and/or his corporation from April 1995 through December 1995. Ultimately, the referee decided that Arthur had advised Zupfer to claim he was ill and later to testify "I don't remember" in response to deposition questions about his relationship and dealings with Arthur.

¶ 71. We see no reason to disturb the referee's credibility determination with respect to this incident, and these findings certainly support the conclusion that Arthur violated SCR 20:3.4(b).

## COUNT VI: SCR 20:8.4(c)

¶ 72. Finally, the disciplinary complaint alleged that Arthur violated SCR 20:8.4(c), which provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." The referee made a number of findings in support of his conclusion that Arthur violated this rule. Some of these findings are summarized as follows:

> Making false statements to Ms. Doyle about his intentions with respect to his use of the Lyndon Station property, as found by the Juneau County Circuit Court.

> Making false statements to the Keefes about the exact location of the Doyle property line, as found by the Juneau County Circuit Court.

> Falsely accusing Ms. Doyle, her attorneys, and the Keefes of engaging in a conspiracy to defraud him, as found by the Juneau County Circuit Court.

> The Honorable Richard Wright's observation that "the court has never found such a liar on the stand and would probably refer him to the DA for perjury."

> "[P]resent[ing] a false defense and [making] misrepresentations to the court" as found by the Juneau County Circuit Court.

> Falsely denying that he advised Zupfer to fake an illness and avoid testifying at his deposition, as found by the Juneau County Circuit Court.

> Falsely testifying about his net worth, as found by the Juneau County Circuit Court.

> Misrepresenting to the court, the Honorable Frank Crivello, that an evidentiary hearing was conducted

610

before Judge Wright on a discovery motion, which Juneau County Circuit Court later stated "that just plain isn't true."

Presenting a false claim against the Keefes to the Bankruptcy Court, the Honorable Margaret Dee McGarity presiding, which warranted a referral to the U.S. Attorney.

Submitting a claim to the Department of Agriculture, Trade and Consumer Protection against the Keefes that falsely alleged a court ordered judgment entered against them in Arthur's favor.

Transferring his personal assets to his wife in a marital property agreement to fraudulently avoid payment of claims, debts and judgments against him; facilitated the transfer of assets to various non-profit corporations in which he was actively involved and had received things of value to fraudulently avoid payment of claims.

¶ 73. Arthur contends that the "actual verbatim transcripts" do not support these findings. He blames the OLR, suggesting it "deliberately engaged in conspicuously fraudulent misconduct."[8]

¶ 74. Specifically, Arthur challenges the referee's finding that he made a misstatement of fact before Judge Crivello, regarding whether an evidentiary hearing had taken place on a discovery issue. Arthur con-

---

[8] Arthur suggests further that the OLR behaved improperly by refusing to provide a party deponent to whom Mr. Arthur could pose questions regarding what admissible evidence OLR had to support the allegations in its complaint, on the grounds that Wis. Stat. § 804.05(2)(e) (2001–02) did not apply to it because OLR is not a governmental agency. We deem this allegation not properly before us and decline to comment further on it.

cedes that "he vacillated by saying both that *it was and was not* an evidentiary hearing." He nonetheless maintains that "no reasonable trier of fact could possibly conclude that Mr. Arthur violated SCR 20:8.4(c) by deceiving the court." He reiterates his position "that the decision of the Juneau County Court in Case No. 95 CV 182 must be considered void because of Attorney Schmukler's misconduct." However, this is not an appeal from the Juneau County court decision.

¶ 75. With respect to the finding that he fraudulently conveyed his assets to his wife in order to avoid payment of debts and other claims against him, Arthur defends his actions, asserting there is nothing inherently improper about a fraudulent conveyance.

¶ 76. Arthur is adept at using various conflicting testimony from the many court proceedings to raise questions about the referee's findings of fact in this disciplinary matter. Having engaged in an independent review of the record, including individual pleadings filed by Arthur that alleged various unsupported claims against Ms. Doyle, her counsel, and others, we have no difficulty concluding that there are sufficient facts of record to support the conclusion that Arthur repeatedly violated SCR 20:8.4(c).

¶ 77. We appreciate that we may not have addressed each and every one of the arguments presented by Arthur. To the extent we have not, it is deemed denied. *See Libertarian Party of Wisconsin v. State,* 199 Wis. 2d 790, 801, 546 N.W.2d 424 (1996) (appellate court need not discuss arguments unless they have "sufficient merit to warrant individual attention").

¶ 78. We turn to the question of the appropriate sanction for Arthur's misconduct. In considering the

612

appropriate sanction, we first consider the seriousness of the conduct. *See In re Disciplinary Proceedings Against Charlton,* 174 Wis. 2d 844, 875, 498 N.W.2d 380 (1993). We also consider the need to protect the public, courts, and legal system from the attorney's repetition of misconduct, to impress upon the attorney the seriousness of the misconduct, and to deter other attorneys from engaging in similar misconduct. *Id.* at 847.

¶ 79. The OLR seeks revocation of Arthur's license to practice law in Wisconsin. The referee observed that these proceedings were "very lengthy and complete" observing further: "it is not possible to avoid the conclusion that there are a number of patterns of substantial improper conduct."

¶ 80. We agree. After careful consideration of the arguments of counsel, review of the extensive record, and the relevant case law, we conclude that revocation of Arthur's license to practice law is the appropriate sanction for Arthur's serious pattern of misconduct and abuse of the litigation process. *See, e.g., In re Disciplinary Proceedings Against Hinners,* 162 Wis. 2d 728, 470 N.W.2d 309 (1991).

¶ 81. We turn to the question of the costs incurred in this matter. Although we directed the parties to brief the issue, they had relatively little to say about the costs. Suffice it to say that Arthur maintains that he should not be financially responsible for any amount of costs, but, as the OLR observes, he has failed to object to the statement of costs with specificity. It is readily apparent to this court that Arthur's own litigation tactics are the primary cause of the unusually high costs of this proceeding. As the OLR states:

[This] is the same lawyer who claims on page 18 of his brief that this is a "petty" matter and then files over 500 pages of discovery documents to OLR, including fourteen motions, seven separate discovery demands, and a 1,000+ page pre-hearing compendium. In the process, Arthur complains in his brief on page 43 that OLR did not respond in a manner he wished concerning his pre-trial motions. Arthur has requested OLR respond to all of his demands, which it did, and now he doesn't want to pay for the time and costs involved.

¶ 82. We accept the referee's recommendation and order Arthur to pay the costs of the disciplinary proceeding.

¶ 83. IT IS ORDERED that the license of Attorney Ronald A. Arthur to practice law in Wisconsin is revoked effective the date of this order.

¶ 84. IT IS FURTHER ORDERED that Attorney Ronald A. Arthur comply with the provisions of SCR 22.26 concerning duties of a person whose license to practice law has been revoked.

¶ 85. IT IS FURTHER ORDERED that within 60 days of the date of this order Attorney Ronald A. Arthur pay to the OLR the costs of the proceeding.

¶ 86. PATIENCE D. ROGGENSACK, J., did not participate.