# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2012AP1845-D |
| COMPLETE TITLE: | In the Matter of Disciplinary Proceedings Against David J. Winkel, Attorney at Law: |
| | |
| | Office of Lawyer Regulation, |
| |        Complainant-Respondent, |
| |    v. |
| | David J. Winkel, |
| |        Respondent-Appellant. |

DISCIPLINARY PROCEEDINGS AGAINST WINKEL

| | |
|---|---|
| OPINION FILED: | July 7, 2015 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 5, 2015 |
| | |
| SOURCE OF APPEAL: | |
|   COURT: | |
|   COUNTY: | |
|   JUDGE: | |
| | |
| JUSTICES: | |
|   CONCURRED: | ABRAHAMSON, J. concurs (Opinion filed). |
|   DISSENTED: | ROGGENSACK, C. J., joined by ZIEGLER, J. dissent(Opinion filed). |
| | GABLEMAN, J. dissents (Opinion filed). |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the respondent-appellant, there were briefs by *Patrick F. Koenen* and *Hinshaw & Culbertson LLP*, Appleton. Oral argument by *Patrick F. Koenen.*

For the complainant-respondent, there was a brief by *Matthew F. Anich* and *Dallenbach, Anich & Wickman, S.C.*, Ashland. Oral argument by *Matthew F. Anich.*

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2012AP1845-D

STATE OF WISCONSIN      :      IN SUPREME COURT

**In the Matter of Disciplinary Proceedings Against David J. Winkel, Attorney at Law:**

**Office of Lawyer Regulation,**

         **Complainant-Respondent,**

   **v.**

**David J. Winkel,**

         **Respondent-Appellant.**

**FILED**

**JUL 7, 2015**

Diane M. Fremgen
Clerk of Supreme Court

ATTORNEY disciplinary proceeding. *Attorney's license suspended.*

¶1 PER CURIAM. Attorney David J. Winkel appeals the report of Reserve Judge Robert E. Kinney, referee, recommending discipline of a four-month license suspension and the imposition of costs. The referee found that Attorney Winkel committed all of the five charged counts of misconduct that were tried at a hearing before the referee. The ethical violations which the referee determined Attorney Winkel committed include incompetent representation, lack of diligence, failure to properly

communicate with his client, and willful failure to provide relevant information, fully answer questions, or furnish documents in the course of an Office of Lawyer Regulation (OLR) investigation.

¶2 After our independent review of the record, we approve the referee's findings of fact and conclusions of law and adopt them. We conclude that Attorney Winkel's misconduct warrants a four-month license suspension. We require Attorney Winkel to pay the full costs of this disciplinary proceeding, which total $42,634.13 as of February 25, 2015.

¶3 Attorney Winkel was licensed to practice law in Wisconsin in 1984 and practices in Neenah. Attorney Winkel's prior disciplinary history includes a public reprimand in 1998 for failing to adequately prepare to represent his clients and to explain their legal matters to them, for failing to competently represent a client in an estate matter, for misrepresenting that he had prepared a document, for failing to respond to successor counsel's requests for information and for the client's file, and for failing to respond to the disciplinary investigation. See In re Disciplinary Proceedings Against Winkel, 217 Wis. 2d 339, 577 N.W.2d 9 (1998). Attorney Winkel was publicly reprimanded again in 2005 for submitting a fee request to the Social Security Administration that misrepresented the amount of time spent by his firm in handling a case on behalf of a client. In re Disciplinary Proceedings Against Winkel, 2005 WI 165, 286 Wis. 2d 533, 706 N.W.2d 661.

¶4 In August 2012, the OLR filed a six-count complaint against Attorney Winkel. This court appointed Reserve Judge Kinney as referee. The referee dismissed one count of the complaint upon stipulation of the parties. The referee held an evidentiary hearing on the remaining five counts over three days in October and November 2013. Both sides submitted post-hearing briefs.

¶5 In March 2014, the referee submitted a report containing his findings of fact, conclusions of law, and a recommendation for discipline. The referee's findings of fact and conclusions of law are summarized below.

¶6 All counts in this case arise out of Attorney Winkel's representation of P.L., an inmate in the Wisconsin prison system. P.L. hurt his leg during recreational activities in the prison yard. A methicillin—resistant staphylococcus aureus (MRSA) infection later developed in the leg.

¶7 P.L. was taken to the prison's Health Services Unit (HSU). There, the nurse observed the leg, gave him some antibiotics, and, using a marker, drew a circle around the visible sore on his leg. She then advised P.L. to return to the HSU if the infection progressed outside the circle.

¶8 The next morning, P.L. saw that the infection had progressed outside the circle. At about 11:00 a.m., P.L. called a guard and explained the situation. At about 11:30 a.m., the guard contacted the HSU, and a nurse ("Nurse Jane Doe") told the guard to have P.L. fill out a "blue slip." "Blue slips" are completed by inmates to request routine health care services.

3

"Blue slips" are only collected once a day at the end of the day, and they are not intended to be used in emergency situations.

¶9 P.L. continued to demand medical attention. At around 4:00 p.m., P.L. was taken to the HSU where he was seen by a physician. The physician directed that P.L. be transported to a local hospital. Within two hours of being admitted to the hospital, surgery was performed to drain the MRSA infection in P.L.'s leg. P.L. remained in the hospital as an in—patient for seven days, all the while being administered intravenous antibiotics to control the MRSA infection.

¶10 P.L., acting pro se, filed an Eighth Amendment ("cruel and unusual punishment") civil rights case in the United States District Court for the Western District of Wisconsin. P.L. sought monetary damages based on his claim that, by delaying his treatment, prison officials had been deliberately indifferent to his serious medical need.

¶11 P.L. hired Attorney Winkel to represent him in his Eight Amendment civil rights suit. P.L. knew Attorney Winkel because Attorney Winkel had represented him on a number of previous occasions.

¶12 Under a written fee agreement, P.L. agreed to pay Attorney Winkel an hourly rate of $200 per hour in this matter, but the hourly fee would only be charged if P.L. was entitled to attorney fees from the defendants. If P.L. was not awarded attorney fees, Attorney Winkel would receive 40% of any recovery. P.L. paid Attorney Winkel an advance of $2,500 to be

used to cover expert witness fees and discovery costs. The fee agreement required that at the conclusion of the representation, Attorney Winkel would return all unearned fees and costs advanced by P.L.

¶13 Attorney Winkel formally appeared on P.L.'s behalf but did little else of value. Attorney Winkel never identified certain unnamed defendants, such as the identity of "Nurse Jane Doe"——the nurse who told the guard to have P.L. submit a "blue slip" requesting routine health care services. Attorney Winkel also failed to timely disclose P.L.'s expert witnesses. Instead, over two months after the expert disclosure deadline had passed, Attorney Winkel filed a motion to extend the deadline, along with a late-filed expert disclosure.

¶14 Defendants moved to strike Attorney Winkel's late-filed expert disclosure. Defendants also moved for summary judgment.

¶15 Attorney Winkel was in a poor position to respond to the defendants' summary judgment motion. Attorney Winkel had not conducted depositions of defendants, had not served any discovery demands, had not served any requests for production of documents, had not served any interrogatories, and had not ascertained the identities of the unnamed defendants. He also had failed to timely answer the defendants' interrogatories, even though the defendants had granted him an extension in which to do so.

¶16 Four days after the summary judgment response brief was due, Attorney Winkel filed a document entitled "Objection to

5

Motion for Summary Judgment." This document failed to respond in any material way to the defendants' summary judgment motion.

¶17 The district court, in a September 29, 2009 order written by Magistrate Judge Crocker, granted the defendants' motion for summary judgment, denied Attorney Winkel's motion to extend the expert disclosure deadline, denied the defendants' motion to strike Attorney Winkel's expert witness disclosure as moot, and directed the clerk of court to enter judgment in favor of defendants and to close the case. In the summary judgment order, Magistrate Judge Crocker stated:

> Plaintiff's case has been doomed by his failure, through his attorney, to meet several deadlines or to respond properly to defendants' motion for summary judgment. . . .
>
> . . . . Plaintiff has never sought to amend his complaint to include the names of the [unnamed] defendants. It is impossible to pursue a claim against unnamed defendants. Despite defendants having raised this issue on summary judgment, plaintiff did not respond to it. . . .
>
> Further, the deadline to disclose expert witnesses—the type of witnesses who might be critical in an Eighth Amendment medical treatment lawsuit— passed without plaintiff disclosing any such witnesses. Instead of seeking an extension of the deadline before it passed, plaintiff waited until . . . over two months after the deadline, to file a motion seeking to amend the briefing schedule by extending the expert disclosure deadline. Plaintiff's attorney's explanation for the delay is that it was "very difficult" to find a doctor. Perhaps this is true, but it is unpersuasive. One might logically expect that locating a qualified physician and obtaining a useful expert opinion would have been at the top of plaintiff's "To Do" list, perhaps even ahead of "File Complaint."

Regardless of the delay in finding and disclosing an expert, extending the expert disclosure deadline would not help plaintiff. The expert doctor's proposed testimony would be irrelevant to the constitutional issues in this civil rights lawsuit. Plaintiff's attorney notes that plaintiff's newly found doctor expert will testify regarding "whether there was any *negligence* in [the] medical care" provided by defendants. However, establishing a violation of a prisoner's rights under the Eighth Amendment requires deliberate indifference on part of the officials, and deliberate indifference entails more than "mere negligence." . . .

Plaintiff also failed to timely respond to defendants' motion for summary judgment. . . . Despite having 30 days to respond to defendants' motion, plaintiff did not file anything regarding defendants' motion until August 28, 2009. The document filed, "Objection to Motion for Summary Judgment," fails to respond in any material way to defendants' motion. . . .

(Docket citations omitted; emphasis added by Magistrate Judge Crocker.)

¶18 Despite the issuance of this order, P.L. remained unaware for many weeks that the defendants had moved for summary judgment, or that Magistrate Judge Crocker had granted the defendants' motion for summary judgment. Several weeks after the court had entered summary judgment against his case, P.L. asked Attorney Winkel to try to settle the case for between $5,000 and $10,000. A few weeks later, P.L. sent another letter to Attorney Winkel asking what had happened to the scheduled trial date, which had just passed. P.L. asked Attorney Winkel whether he had settled the case or had gotten the trial postponed without P.L.'s permission. P.L. also asked Attorney Winkel what discovery he had obtained, and whether Attorney

7

Winkel had determined which nurse had been working at the prison on the day in question.

Attorney Winkel wrote back to P.L. with the following:

I see that you were unable to obtain any useful opinions from the hospital; which is the same problem I had.  You and I talked about this.  I could not get _any_ offers from the state because we had no ammunition.  Sometimes, a party cannot prove in court what we know to be true.  This is one of those cases.

As such, enclosed please find a check from my trust account for the balance of your money for the lawsuit, since we do not have adequate evidence to make it worthwhile to pursue the matter any further, nor can we get over Motions for Summary Judgments.

This will hopefully allow you to concentrate on your remaining time and getting out on a good note.

(Emphasis in original.)  Attorney Winkel handwrote on the bottom of the letter a note that states:  "I paid [the medical expert] $400, and CBS 6.59 [for collect phone calls], leaving $2,093.41 for you.  Sorry we couldn't get a settlement offer."

¶19  In a subsequent letter to Attorney Winkel, P.L. wrote that he had never authorized Attorney Winkel to cease litigation; that he wanted the case reopened; and that he wanted copies of all discovery so that he could represent himself.

¶20  On December 21, 2009, P.L. sent a letter to United States District Court Judge Barbara B. Crabb, stating that Attorney Winkel had stopped litigating the case without P.L.'s consent and that he wanted to litigate the case pro se.  A pro se case analyst from the Western District wrote back to P.L., explaining that the case was closed and enclosing a copy of the docket sheet and final order.

8

¶21 P.L. ultimately filed a grievance with the OLR against Attorney Winkel. In his response to the grievance, Attorney Winkel told the OLR that he had personally mailed P.L. a copy of defendants' motion for summary judgment, as well as a handwritten note asking P.L. if he wanted Attorney Winkel to arrange for medical testimony to rebut the defendants' arguments. Attorney Winkel also told the OLR that he had informed P.L. that the case was dismissed and no trial would be held.

¶22 In August 2012, the OLR filed a complaint against Attorney Winkel. As relevant here, the complaint charged Attorney Winkel with the following counts of misconduct.

- Count One: By failing to properly oppose defendants' motion for summary judgment, and by failing to display the knowledge and skills necessary to competently represent P.L. in the Eighth Amendment civil rights case, Attorney Winkel violated Supreme Court Rule (SCR) 20:1.1.[1]

- Count Two: By failing to oppose defendants' motion for summary judgment by the court—ordered deadline, by failing to file an expert witness disclosure by the court-ordered deadline, by failing to amend plaintiff's complaint to reflect the name of the

---

[1] SCR 20:1.1 provides that "[a] lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

"Jane Doe" defendant, and by failing to conduct any meaningful discovery in P.L.'s case, Attorney Winkel violated SCR 20:1.3.[2]

- Count Three: By failing to inform P.L. of defendants' motion for summary judgment, by failing to inform P.L. that the court granted defendants' motion for summary judgment, by failing to provide P.L. with copies of defendants' motion for summary judgment and the order granting defendants' summary judgment, and by failing to keep P.L. apprised of the status of the case, Attorney Winkel violated SCR 20:1.4(a)(3).[3]

- Count Five: By concealing from P.L. that defendants made a motion for summary judgment and that the court granted defendants' motion, leading to the dismissal of the action, Attorney Winkel violated SCR 20:8.4(c).[4]

- Count Six: Having concealed from P.L. that defendants made a motion for summary judgment and that the court granted defendants' motion, leading

---

[2] SCR 20:1.3 provides that "[a] lawyer shall act with reasonable diligence and promptness in representing a client."

[3] SCR 20:1.4(a)(3) provides that a lawyer shall "keep the client reasonably informed about the status of the matter."

[4] SCR 20:8.4(c) provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

to the dismissal of the action, and by thereafter representing to the OLR that he had informed P.L. of the aforesaid events, Attorney Winkel violated SCR 22.03(6),[5] enforced under SCR 20:8.4(h).[6]

¶23 After a three-day hearing, the referee determined that Attorney Winkel had committed each of the above five counts of misconduct. The referee's reasoning may be summarized as follows.

¶24 As to Counts One and Two (incompetent representation and lack of diligence), the referee found that Attorney Winkel had never before litigated a deliberate indifference claim; that, although Attorney Winkel claimed to have performed research, he did not copy any cases, make any notes, or bill any time for legal research; and that he used the wrong legal standard in his expert witness disclosure. The referee noted that Attorney Winkel's filings with the district court——particularly his motion to extend already-expired deadlines and his "objection" to the defendants' summary judgment motion——gave

---

[5] SCR 22.03(6) provides that "[i]n the course of the investigation, the respondent's wilful failure to provide relevant information, to answer questions fully, or to furnish documents and the respondent's misrepresentation in a disclosure are misconduct, regardless of the merits of the matters asserted in the grievance."

[6] SCR 20:8.4(h) provides that it is professional misconduct for a lawyer to "fail to cooperate in the investigation of a grievance filed with the office of lawyer regulation as required by SCR 21.15(4), SCR 22.001(9)(b), SCR 22.03(2), SCR 22.03(6), or SCR 22.04(1)."

the impression that he "did not know what he was doing, that he was over his head."  The referee noted that there were many actions that Attorney Winkel could have taken to advance P.L.'s case (e.g., he could have filed an expert affidavit, medical literature, and a brief explaining that MRSA infections require immediate medical attention), but he failed to do anything of substance.  The referee wrote that while Attorney Winkel may not have been able to defeat defendants' summary judgment motion, he needed to do more than what he did in order to provide competent representation.

¶25 The referee next addressed Counts Three and Five, which involve Attorney Winkel's failure to properly communicate with P.L.  Attorney Winkel told the referee that he had sent P.L. all of the important case documents, as proven by his writings on a series of post-it notes directing his secretary to send the documents to P.L.  The referee rejected Attorney Winkel's claim.  The referee noted that Attorney Winkel's secretary testified at deposition that she neither had a recollection of sending the documents, nor could she discern from the post-it notes whether they had been sent.  The secretary also testified at deposition and at the hearing that she could not tell if any of thirteen different crucial documents had been sent to P.L.  The referee noted that Attorney Winkel's post-it note "system" had only a "veneer of documentary evidence," and was not the type of contemporaneous written evidence on which attorneys and judges customarily rely as proof of mailing.

12

¶26 The referee also remarked that one particular letter from Attorney Winkel showed both his dishonesty and his failure to adequately communicate with P.L. In a letter to P.L. written after the district court had granted summary judgment to the defendants, Attorney Winkel stated that "we do not have adequate evidence to make it worthwhile to pursue the matter any further, nor can we get over Motions for Summary Judgments." The referee reasoned that Attorney Winkel would not have written this statement if he had previously advised P.L. of the truth of the matter: that the case had been dismissed on summary judgment many weeks earlier. The referee further reasoned that, given P.L.'s litigious nature, Attorney Winkel had an incentive to gloss over the already-dismissed status of the case in order to avoid a legal malpractice claim.

¶27 The referee next moved to Count Six, which charged Attorney Winkel with willfully failing to provide relevant information, fully answer questions, or furnish documents in the course of an OLR investigation. The referee noted that in his answers to the OLR's requests for admission, Attorney Winkel denied that: (1) he failed to provide P.L. with a copy of defendants' motion for summary judgment; (2) he failed to inform P.L. that the district court had granted defendants' motion for summary judgment; and (3) he failed to provide P.L. with a copy of the order granting defendants' motion for summary judgment. The referee held that Attorney Winkel's denials amounted to misrepresentation and a willful failure to provide relevant information to the OLR.

13

¶28 With that, the referee concluded that Attorney Winkel engaged in professional misconduct as set forth in Counts One, Two, Three, Five, and Six.

¶29 The referee next addressed the issue of sanctions. The referee found the following aggravating factors to be present:  the existence of a prior disciplinary record; a pattern of misconduct; the presence of multiple offenses; an intentional failure to comply with disciplinary rules or orders; the submission of false evidence, statements, or other deceptive practices during the disciplinary process; a refusal to acknowledge the wrongful nature of conduct; substantial experience in law practice at the time in question; and harm to a client.  Of these aggravating factors, the one that most concerned the referee was Attorney Winkel's tendency to misrepresent the truth.  This tendency was noticeable in Attorney Winkel's previous two disciplinary matters, the referee noted.  See Winkel, 2005 WI 165; Winkel, 217 Wis. 2d 339.

¶30 On the mitigating side, the referee found only one factor:  the remoteness in time of Attorney Winkel's prior offenses.

¶31 The referee noted the range of sanctions imposed in previous, arguably similar cases:  In re Disciplinary Proceedings Against Harris, 2013 WI 8, 345 Wis. 2d 239, 825 N.W. 2d 285 (five-month suspension for failing to inform client of dismissal of matter and misrepresenting status of matter that had been dismissed); and In re Disciplinary Proceedings Against Hammis, 2011 WI 3, 331 Wis. 2d 19, 793 N.W. 2d 884 (four-month

14

suspension for billing the State Public Defender for work the lawyer did not actually perform, continuing to practice law after receiving notice of administrative suspension, willingly misleading a sitting judge about whether or not he had a valid law license, failing to refund unearned fees, and failing to respond to the OLR); and In re Disciplinary Proceedings Against Lister, 2010 WI 108, 329 Wis. 2d 289, 787 N.W.2d 820 (60-day suspension for failing to pursue client's federal civil rights action, failing to inform client that court had dismissed lawsuit, failing to promptly respond to numerous requests from successor counsel to forward client's case file, failing to refund to client unused balance of retainer fee, and failing to return messages left by the OLR).

¶32 Ultimately, the referee recommended the imposition of a four-month suspension——two months longer than what the OLR had proposed in its complaint. The referee wrote that the "aggravating factor which is most concerning to me is [Attorney Winkel's] submission of false evidence, false statements or other deceptive practices during the disciplinary hearing. This factor would be very serious even if [Attorney Winkel] had no prior disciplinary history. Unfortunately, however, his prior disciplinary history involves this very same type of misconduct." The referee continued:

> I observed [Attorney Winkel's] testimony over most of three (3) days. In the opinion of this referee, he did not help himself. While his answers were generally carefully worded, they were oftentimes non-responsive. Simple questions were met with circumlocution and prevarication. [Attorney Winkel's]

15

own attorney asked him at his deposition whether two particular documents had been mailed to [P.L.] [Attorney Winkel's] answer, that he did not know, and he had no contemporaneous evidence on the subject, is buried in layers of obfuscation.

Most disturbingly . . . there are major contradictions between [Attorney Winkel's] deposition testimony and his hearing testimony. It is as if the time between the deposition and the hearing was used to shore up and correct perceived shortcomings in his deposition testimony.

The OLR's recommendation of a 60-day suspension may have been appropriate before the hearing started; by the time it ended it was definitely not sufficient. Were I to recommend a 60-day suspension here I would be undercutting the values of truthfulness and honesty which are at the very heart of the legal system.

(Footnotes and citations omitted.)

¶33 Attorney Winkel appeals. In conducting our review, we will affirm the referee's findings of fact unless they are found to be clearly erroneous, but we will review the referee's conclusions of law on a de novo basis. See In re Disciplinary Proceedings Against Inglimo, 2007 WI 126, ¶5, 305 Wis. 2d 71, 740 N.W.2d 125. The court may impose whatever sanction it sees fit regardless of the referee's recommendation. See In re Disciplinary Proceedings Against Widule, 2003 WI 34, ¶44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶34 On appeal, Attorney Winkel does not challenge any of the factual findings that underlie the counts of misconduct or the legal conclusions of misconduct. Attorney Winkel challenges only whether the referee's recommended sanction of a four-month suspension is appropriate.

¶35 Attorney Winkel maintains that his conduct warrants only a public reprimand. In support of this claim, Attorney Winkel levies a number of broad-based attacks on the OLR's disciplinary hearing process. Attorney Winkel argues, first, that his disciplinary proceeding should have been bifurcated to decide the merits issue separate from the determination of sanctions; otherwise, he says, it was impossible for him to effectively contest guilt and introduce mitigating evidence at the same hearing. Attorney Winkel argues, second, that the referee should not have learned of his disciplinary history before deciding the merits of a disciplinary case; he theorizes that the referee's knowledge of his disciplinary history possibly tainted the referee's fact-finding. Attorney Winkel argues, third, that the referee erred by increasing his sanction recommendation based on a finding that Attorney Winkel provided unreliable testimony during the disciplinary hearing; he argues that any suspicion of untruthfulness on his part could only be considered in the context of a brand-new disciplinary proceeding.

¶36 In addition to these systemic challenges to the OLR's disciplinary process, Attorney Winkel levels various criticisms at the referee's performance. Attorney Winkel argues that the referee failed to give him credit for returning to P.L. the unused portion of the advance fee payment; failed to appreciate that he has acknowledged his deficiencies in handling P.L.'s case; and failed to note that he did not personally benefit from his misconduct. He posits, as a mitigating factor, that his

17

misconduct did no harm given that——as Attorney Winkel's counsel stated in appellate briefing and at oral argument——there was "no merit" to P.L.'s Eighth Amendment civil rights case.  Finally, Attorney Winkel argues that the referee failed to appreciate that he has already been admonished by the district court in its summary judgment order; that he has had to incur significant legal bills in his defense in this disciplinary matter; and that a suspension will hurt him, his clients, and his staff.

¶37 We reject all of Attorney Winkel's arguments, starting first with his systemic challenges to the OLR disciplinary process.  Attorney Winkel has forfeited any argument that the disciplinary hearing should have been bifurcated to decide the merits issue separate from the determination of sanctions.  If Attorney Winkel truly believed that the referee——an experienced judge and referee——was incapable of differentiating mitigating evidence from admissions of misconduct, he should have asked the referee to hold a bifurcated hearing.  He did not; he points to nowhere in the record where such a request was preserved.  It is too late to complain about it now.  See In re Disciplinary Proceedings Against Netzer, 2014 WI 7, ¶45, 352 Wis. 2d 310, 841 N.W.2d 820; see also United States v. Boyd, 86 F.3d 719, 722 (7th Cir. 1996) (defendant cannot "plant an error and grow a risk-free trial").

¶38 We are also unpersuaded by Attorney Winkel's argument that it was improper for the referee to learn of Attorney Winkel's disciplinary history before deciding the merits of this case.  Attorney Winkel speculates that perhaps the referee, in

18

evaluating the merits of this case, improperly assumed that it was more likely that Attorney Winkel committed the charged misconduct simply because he had previously committed misconduct——akin to the forbidden inference of criminal propensity that a jury might draw from prior bad act evidence. See Wis. Stat. § 904.04(2). But this argument does not square with the fact that Attorney Winkel challenges none of the referee's factual findings or legal conclusions of misconduct; his sole challenge in this appeal is to the amount of discipline that the referee recommended. We also find absolutely no evidence to support what Attorney Winkel seems to imply: that the referee prejudged him and denied him a fair opportunity to defend against the misconduct charges.

¶39 Attorney Winkel is also mistaken in arguing that, in making a sanctions recommendation, neither the referee nor this court may consider the referee's finding that some of Attorney Winkel's hearing testimony was unreliable. There is no dispute that Attorney Winkel's testimony during the disciplinary hearing would not permit a separate, new misconduct finding in this proceeding; due process considerations dictate that attorneys receive fair notice of misconduct charges against them and an opportunity to respond. In re Ruffalo, 390 U.S. 544, 550-51 (1968). Neither can it be disputed, however, that this court is charged with the responsibility of protecting the public from attorneys who are not fully truthful.

¶40 Thus, this court will not simply ignore the referee's uncontested findings that Attorney Winkel's hearing testimony

19

was plagued with "non-responsive" answers, "circumlocution and prevarication," "layers of obfuscation," and conflicts with deposition testimony. Just as in criminal cases, where a trial court may not add an additional term for perjury to a convicted defendant's sentence but may consider a defendant's veracity at trial as part of the exercise of sentencing discretion, so too is it entirely appropriate for this court to consider Attorney Winkel's attitude toward the truth in formulating its disciplinary sanction. See Lange v. State, 54 Wis. 2d 569, 575, 196 N.W.2d 680 (1972); see also American Bar Association Standards for Imposing Lawyer Sanctions, § 9.22(f) (listing as an aggravating factor the "submission of false evidence, false statements, or other deceptive practices during the disciplinary process"); see also In re Disciplinary Proceedings Against Eisenberg, 2013 WI 37, ¶34 n.9, 347 Wis.2d 116, 833 N.W.2d 46 (referee's comments about the respondent attorney's "conduct and testimony in this proceeding are proper subjects of a referee's report").

¶41 We also are unpersuaded by Attorney Winkel's numerous criticisms of the referee's performance. To begin, the referee did not err in declining to credit Attorney Winkel for his return to P.L. of the unused portion of the advance fee payment. Attorney Winkel was obligated to return those funds by the terms of his fee agreement.

¶42 The referee similarly did not err in declining to credit Attorney Winkel for his supposed regret over the way he handled P.L.'s case. The referee was clearly troubled by

20

Attorney Winkel's demeanor during the disciplinary hearing: the referee described portions of his hearing testimony as displaying a sense of "exaggerated indignation" that was both "specious and misplaced"; as containing "major contradictions between [his] deposition testimony and his hearing testimony"; and as marked by "circumlocution," "prevarication," and "layers of obfuscation." Given the facts as they unfolded before the referee, we do not question the referee's determination that Attorney Winkel has not shown that he fully appreciates the wrongful nature of his conduct.

¶43 The referee also did not err in declining to view as a mitigating factor Attorney Winkel's lack of personal benefit from his misconduct. Attorney Winkel argues in his appellate brief that he "did not stand to gain anything personally by making untimely filings or letting the case get dismissed." While this statement may be literally true, we do not find it particularly comforting, especially given our duty to protect the public from attorney misconduct. See Preamble to SCR Chapter 21.

¶44 We are similarly unpersuaded by Attorney Winkel's argument that the meritless nature of P.L.'s civil rights lawsuit counteracts his own blameworthiness. Attorney Winkel states explicitly in his briefs, and also stated at oral argument, that P.L.'s lawsuit had "no merit." It would be an odd disciplinary system if maintaining a meritless lawsuit counted as a mitigating circumstance, especially since

21

maintaining a meritless lawsuit is itself a sanctionable offense.  See SCR 20:3.1.

¶45 Finally, while we acknowledge that a suspension of Attorney Winkel's law license may very well hurt his law practice, we have previously made clear that such an effect is not an appropriate factor in establishing a level of discipline. See In re Disciplinary Proceedings Against Lamb, 2011 WI 101, ¶31, 338 Wis. 2d 1, 806 N.W.2d 439 ("Any suspension of an attorney's license to practice law is likely to have a detrimental impact on the attorney's livelihood.").

¶46 In the end, it appears that in this disciplinary proceeding, Attorney Winkel chose a litigation strategy he now regrets:  an "all or nothing" strategy of going for an outright exoneration.  The strategy failed, leaving him with a record that contains little mitigating evidence, an admonishment from a federal magistrate judge, and a referee's report bristling with factual findings and credibility determinations adverse to him. Having lost the battle on the facts, he hopes to win the war on appeal by attacking the fairness of the OLR disciplinary process and the referee.  We reject Attorney Winkel's efforts.[7]

---

[7] To the extent we have not addressed each and every one of the many arguments presented by Attorney Winkel during appellate briefing and oral argument, such arguments are deemed denied. See Libertarian Party of Wis. v. State, 199 Wis. 2d 790, 801, 546 N.W.2d 424 (1996) (appellate court need not discuss arguments unless they have "sufficient merit to warrant individual attention").

¶47 Turning specifically to the level of discipline required, we disagree with Attorney Winkel's argument that a public reprimand will suffice. We must impose the discipline needed to protect the public, the courts, and the legal system from Attorney Winkel's repetition of misconduct, to impress upon him the seriousness of his misconduct, and to deter other attorneys from engaging in similar misconduct. See In re Disciplinary Proceedings Against Arthur, 2005 WI 40, ¶78, 279 Wis. 2d 583, 694 N.W.2d 910. We also must bear in mind that discipline is generally progressive in nature. See, e.g., In re Disciplinary Proceedings Against Nussberger, 2006 WI 111, ¶27, 296 Wis.2d 47, 719 N.W.2d 501. Considering these factors, we conclude that more than a public reprimand is required. This is the third time the court has had occasion to discipline Attorney Winkel for professional misconduct. Clearly, his two previous public reprimands have not sufficiently impressed upon him the need to scrupulously adhere to the rules of professional conduct for attorneys. His course of conduct requires a license suspension.

¶48 We further conclude that a suspension greater than the 60-day minimum suspension is in order. In re Disciplinary Proceedings Against Grady, 188 Wis. 2d 98, 108-09, 523 N.W.2d 564 (1994) (explaining that generally the minimum length of a license suspension is 60 days). We are particularly concerned with the pattern of misconduct Attorney Winkel has displayed: in both this case and in his previous two disciplinary matters, Attorney Winkel has shown a willingness to bend the truth to

23

help himself.  We agree with the referee's statement that a 60-day minimum suspension would "undercut[] the values of truthfulness and honesty which are at the very heart of the legal system."  We therefore conclude, as did the referee, that a four-month suspension is an appropriate response, justified by our precedent.  See, e.g., Harris, 345 Wis. 2d 239 (five-month suspension for lawyer with disciplinary history who failed to inform client of dismissal of matter, misrepresented the status of the matter that had been dismissed, and failed to cooperate with the OLR investigation).

¶49 Finally, we turn to the issue of costs.  The OLR has requested costs in the total sum of $42,634.13.  This amount consists of $37,002.13 in pre-appeal costs, and $5,632.00 in appellate costs.  Attorney Winkel does not challenge the pre-appeal costs.  He does, however, challenge the appellate costs, claiming that they amount to "piling on."  Attorney Winkel also claims that the OLR's appellate costs were needlessly inflated by a change in its position regarding the appropriate length of suspension:  at oral argument, the OLR asked the court to impose the 60-day suspension that it had requested in its complaint, whereas in its appellate brief-in-chief, the OLR asked the court to approve the referee's recommendation of a four-month suspension.  Attorney Winkel argues that the OLR probably performed some appellate work that was "wasteful" in that it was not consistent with the OLR's ultimate position.

¶50 We deny Attorney Winkel's objection.  Our rules require that a respondent who objects to a statement of costs

24

"must state what he or she considers to be a reasonable amount of costs." SCR 22.24(2). Attorney Winkel did not do so. He apparently believes that a "reasonable amount" of costs for the OLR to have incurred on appeal is zero, as he asks this court to deny the OLR's appellate costs in their entirety. We decline to do so. As shown by the discussion above, Attorney Winkel has vigorously advocated on appeal for the imposition of only a public reprimand. He has advanced a wide variety of substantive and procedural challenges to the referee's report and recommendation, all of which the OLR has responded to in briefing and at oral argument. The OLR's requested appellate costs of $5,632.00 do not strike us as unreasonable or unnecessary, nor do we have any reason to believe that they were materially driven up by the OLR's arguments as to the appropriate suspension length.

¶51 IT IS ORDERED that the license of David J. Winkel to practice law in Wisconsin is suspended for a period of four months, effective August 6, 2015.

¶52 IT IS FURTHER ORDERED that within 60 days of the date of this order, David J. Winkel shall pay to the Office of Lawyer Regulation the costs of this proceeding.

¶53 IT IS FURTHER ORDERED that David J. Winkel shall comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.

25

¶54 IT IS FURTHER ORDERED that compliance with all conditions of this order is required for reinstatement. <u>See</u> SCR 22.28(2).

¶55 SHIRLEY S. ABRAHAMSON, J. *(concurring).* I join the per curiam. I write separately to point out that Attorney Winkel's comments about bifurcating the hearing to determine the merits of the violation apart from determining sanctions might be a subject of study for the Lawyer Regulation Committee that I am proposing.

¶56 On February 6, 2015, I filed rule petition 15-01 to create supreme court rules providing for a Lawyer Regulation Committee to review the Rules of Professional Conduct for Attorneys (chapters 20 and 22 of the supreme court rules) and the organization, operation, and procedures of the lawyer discipline system, including the OLR, District Committees, Preliminary Review Committee, Referees, and Board of Administrative Oversight, and to create a Lawyer Regulation Review Committee. The court unanimously agreed to conduct a public hearing on this proposal in the fall of 2015. The subject of bifurcation can be a subject of study for the Lawyer Regulation Committee, if my rule petition is adopted.

1

¶57 PATIENCE DRAKE ROGGENSACK, C.J. *(dissenting).* The Office of Lawyer Regulation (OLR) initially requested that we impose 60 days suspension for the six counts of misconduct that it alleged.[1] The referee recommended four months suspension for the five counts that OLR proved and for the referee's conclusion that David J. Winkel was not honest in his testimony. At oral argument, which was held subsequent to the parties receiving the referee's findings and recommendation, OLR again requested that we impose 60 days suspension for the five counts of misconduct.

¶58 I respectfully dissent because by imposing the referee's recommended four month suspension, which is double what OLR sought, the majority appears to have adopted the referee's conclusion that Attorney Winkel was not honest in his testimony at the hearing the referee conducted. However, Winkel was not charged with giving untruthful testimony to the referee. Therefore, to increase his punishment based on the referee's conclusion that he was untruthful denies Winkel due process of law.

¶59 To explain further, the referee recommended a 100% increase in the 60-day suspension that the OLR requested because the referee believed that Winkel was not honest in his testimony at the referee's hearing. In that regard the referee said,

> OLR's recommendation of a 60-day suspension may have been appropriate before the hearing started; by the time it ended it was definitely not sufficient. Were I to recommend a 60-day suspension here I would be

---

[1] OLR dismissed Count 4 prior to the hearing before the referee.

1

undercutting the values of truthfulness and honesty which are at the very heart of the legal system.[2]

¶60 While the referee's comments about Winkel's truthfulness may be a basis for a new disciplinary charge, to discipline Winkel for a count of misconduct without notice or an opportunity to be heard violates Winkel's right to due process. As we have held, an attorney has a constitutional due process right in a disciplinary proceeding to "prior notice of the charges, the right to prepare and defend against the charges, and the right to a full hearing" thereon. In re Disciplinary Proceedings Against Gamino, 2005 WI 168, ¶48, 286 Wis. 2d 558, 707 N.W.2d 132. Winkel had no notice of a charge that he gave untruthful testimony, nor the right to defend against it, nor a hearing on whether the referee's conclusion was correct. Because due process is foundational to our disciplinary process, and because Winkel was not accorded due process, I respectfully dissent.

¶61 I also write because I have an additional concern about what is permitted when OLR proceeds on an ethical allegation. My concern is that by providing proof of past disciplinary history of an attorney as he or she attempts to defend against current charges, it is possible that a referee's opinion of an attorney's alleged misconduct may be prejudiced.

¶62 Here, the referee commented about Winkel's veracity after his review of Winkel's prior disciplinary history. The

---

[2] Referee's report, p. 60.

last disciplinary matter arose from 2003 conduct, 12 years ago.[3] However, the referee drew from those two cases as a foundation for his conclusion in this case. He also reviewed the underlying reports of the referees on those two cases, even though the reports were not in the record of this case.[4] As he was drawing his conclusions, the referee said, "his prior disciplinary history involves this very same type of misconduct. In this regard, a review of not only the two prior decisions of this Court, but also the underlying referees' reports, is instructive."[5]

¶63 Winkel's counsel noted the effect of those prior proceedings on the referee's consideration of Winkel's defense. He suggested that, as with a jury, a fact-finding referee should not be able to employ a defendant's past disciplinary history as proof of present conduct. I agree with Winkel's counsel that past disciplinary history should not be part of prosecution for a new charge, although it is relevant in deciding on the sanction if charges are proved. I urge my colleagues on the court to consider whether we need to amend our SCR ch. 20 and ch. 22 to address this concern.

---

[3] In re Disciplinary Proceedings Against Winkel, 2005 WI 165, ¶2, 286 Wis. 2d 533, 706 N.W.2d 661 (public reprimand); and In re Disciplinary Proceedings Against Winkel, 217 Wis. 2d 339, 340, 577 N.W.2d 9 (1998) (public reprimand).

[4] Referee's report pp. 52-54.

[5] Id., p. 52.

3

¶64 I am authorized to state that Justice ANNETTE KINGSLAND ZIEGLER joins this dissent.

¶65 MICHAEL J. GABLEMAN, J. *(dissenting)*. I dissent from the Court's opinion. I agree with Chief Justice Roggensack that a 60 day suspension is appropriate.