# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2012AP1827-D |
| COMPLETE TITLE: | In the Matter of Disciplinary Proceedings Against John J. Carter, Attorney at Law: <br><br> Office of Lawyer Regulation, <br>        Complainant-Respondent, <br>    v. <br> John J. Carter, <br>        Respondent-Appellant. |

---

DISCIPLINARY PROCEEDINGS AGAINST CARTER

---

| | |
|---|---|
| OPINION FILED: | December 12, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 10, 2014 |

---

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | |
|   COUNTY: | |
|   JUDGE: | |

---

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | |
|   DISSENTED: | |
|   NOT PARTICIPATING: | PROSSER, ROGGENSACK, JJ., did not participate. |

---

ATTORNEYS:

For the respondent-appellant, there were briefs by *Franklyn M. Gimbel*, *Kathryn A. Keppel*, and *Gimbel, Reilly, Guerin & Brown LLP*, Milwaukee, and oral argument by *Franklyn M. Gimbel*.

For the complainant-respondent, there was a brief by *Matthew J. Price*, and *Foley & Lardner LLP*, Milwaukee, and oral argument by *Matthew J. Price*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2012AP1827-D

STATE OF WISCONSIN : IN SUPREME COURT

**In the Matter of Disciplinary Proceedings Against John J. Carter, Attorney at Law:**

**Office of Lawyer Regulation,**

             **Complainant-Respondent,**

      **v.**

**John J. Carter,**

             **Respondent-Appellant.**

**FILED**

**DEC 12, 2014**

Diane M. Fremgen
Clerk of Supreme Court

ATTORNEY disciplinary proceeding. *Attorney's license suspended.*

¶1 PER CURIAM. We review a referee's report and recommendation concluding that Attorney John J. Carter violated the rules of professional conduct in connection with his representation of N.N. The referee recommended that this court impose a three-year suspension of Attorney Carter's law license and that it require Attorney Carter to pay full costs in connection with this matter, which total $6,680.62 as of September 24, 2014. We adopt the referee's findings of fact,

conclusions of law, and recommendation regarding discipline and costs.

¶2 Attorney Carter was admitted to practice law in Wisconsin in 1974. He has no disciplinary history.

¶3 On August 16, 2012, the Office of Lawyer Regulation (OLR) filed a complaint against Attorney Carter alleging 11 counts of professional misconduct arising out of his representation of his former client, N.N. Attorney Carter filed an answer and Christine Harris Taylor was appointed as referee in the matter.

¶4 Attorney Carter later entered a stipulation by which he withdrew his answer; pled no contest to the 11 counts of misconduct charged in the OLR complaint; and agreed that the referee could use the allegations of the complaint as a factual basis for the referee's determination of misconduct. Attorney Carter reserved his right to argue the appropriate sanction. After a hearing, the referee filed a report recommending the above-stated discipline and finding the following facts.

¶5 Attorney Carter represented N.N. in the sale of her business. Attorney Carter and N.N. did not enter into any written fee agreement for this work. In January 2009, the buyer of N.N.'s business wired a significant portion of the sale price——$112,500——into Attorney Carter's trust account. Despite N.N.'s repeated requests, Attorney Carter did not release this amount to N.N. Over the course of the next few months, Attorney Carter converted a total of $72,053.59 of N.N.'s funds held in

2

trust: $32,400 to his own purposes and $39,653.59 attributable to third party purposes.

¶6 In answer to N.N.'s repeated requests for her funds, Attorney Carter lied to N.N., telling her that he had placed her funds in various short-term investment instruments which had not yet matured. Attorney Carter maintained this lie for many months.

¶7 Occasionally, Attorney Carter made payments to N.N. of her funds held in trust. These periodic payments totaled just over $90,000 by September 2009.

¶8 During the first year of his work for N.N. related to the sale of her business, Attorney Carter did not send N.N. any bills for his work, despite N.N.'s several requests for a bill. Without informing N.N., Attorney Carter issued a $5,000 trust account check to himself. The check bore a notation that it was for a partial fee payment for the N.N. matter. Attorney Carter also requested and received from N.N. two checks totaling $7,000 as payment for fees.

¶9 In late October 2009, Attorney Carter sent N.N. a bill for his work. The bill listed a subtotal of $66,930 in fees, for 223.1 hours of work at $300 per hour. The bill then listed a 25% reduction in the number of hours worked, which reduced the total to $50,400. From that figure, Attorney Carter subtracted $7,000 for the two checks that N.N. had sent him for fees, for a total net due of $43,400. The bill was itemized by general categories of work ("Correspondence," "Meetings," "Telephone Conferences," "Draft/Review Documents," "Research") rather than

by specific entries. The billing statement made no reference to the $5,000 in fees that Attorney Carter had paid himself, without N.N.'s knowledge, out of his trust account.

¶10 N.N. was surprised to receive the $43,400 bill from Attorney Carter, as she believed the two had never agreed to the terms of Attorney Carter's fees, and his $300 hourly rate was considerably higher than the rates he had charged her in previous legal matters.

¶11 When N.N. objected to the bill, Attorney Carter became defensive and adversarial. He claimed that N.N. had strategically not insisted upon a written fee agreement so that she could later dispute his fees. He threatened to take the fee dispute to court. He refused to release the remainder of N.N.'s funds in his trust account until the fee dispute was resolved.

¶12 Ultimately, N.N. agreed to pay a total of $38,970 for Attorney Carter's work. N.N. and Attorney Carter agreed that Attorney Carter would offset that amount by the $7,000 in checks that N.N. had already sent him for fees, and by the amount of N.N.'s funds that remained in Attorney Carter's trust account. The amount of fees still owing after these offsets was $8,079.89. N.N. sent Attorney Carter a check for that amount. At the time she sent this check, N.N. was still unaware that Attorney Carter had unilaterally withdrawn $5,000 from his trust

account as a partial fee payment. The record is unclear as to whether N.N. ever became aware of this withdrawal.[1]

¶13 Based on the stipulated facts set forth above, Attorney Carter pled no contest to the following seven counts of misconduct:

- Count 1: By failing to enter into a written fee agreement with N.N. for his representation of her in the sale of her business and other matters, Attorney Carter violated Supreme Court Rule (SCR) 20:1.5(b)(1).[2]

- Count 2: By failing to promptly disburse N.N.'s $112,500 in sale proceeds pursuant to her requests, and by refusing to release the balance of such sale

---

[1] The parties have informed us that N.N. died before the OLR filed its complaint against Attorney Carter.

[2] SCR 20:1.5(b)(1) provides:

The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate as in the past. If it is reasonably foreseeable that the total cost of representation to the client, including attorney's fees, will be $1000 or less, the communication may be oral or in writing. Any changes in the basis or rate of the fee or expenses shall also be communicated in writing to the client.

proceeds to her until they had resolved their fee dispute, Attorney Carter violated SCR 20:1.15(d)(1).[3]

- Count 3: By failing to respond to N.N.'s requests for the status of her funds, Attorney Carter violated SCR 20:1.4(a)(4).[4]

- Count 4: By failing to advise N.N. that he had withdrawn $5,000 in fees without providing her any notice whatsoever, Attorney Carter violated SCR 20:1.15(g)(1).[5]

---

[3] SCR 20:1.15(d)(1) provides:

Upon receiving funds or other property in which a client has an interest, or in which the lawyer has received notice that a 3rd party has an interest identified by a lien, court order, judgment, or contract, the lawyer shall promptly notify the client or 3rd party in writing. Except as stated in this rule or otherwise permitted by law or by agreement with the client, the lawyer shall promptly deliver to the client or 3rd party any funds or other property that the client or 3rd party is entitled to receive.

[4] SCR 20:1.4(a)(4) provides that a lawyer shall "promptly comply with reasonable requests by the client for information."

[5] SCR 20:1.15(g)(1) provides:

At least 5 business days before the date on which a disbursement is made from a trust account for the purpose of paying fees, with the exception of contingent fees or fees paid pursuant to court order, the lawyer shall transmit to the client in writing all of the following:

a. an itemized bill or other accounting showing the services rendered;

b. notice of the amount owed and the anticipated date of the withdrawal; and

(continued)

6

- Count 5:   By failing to hold at least $72,053.59 of N.N.'s funds in trust and converting them to his own purposes or for third party purposes without her knowledge or consent, Attorney Carter violated SCR 20:1.15(b)(1)[6] and SCR 20:8.4(c).[7]

- Count 6:   By engaging in an ongoing scheme for months of making repeated misrepresentations to N.N. that he had invested on her behalf the balance of her $112,500 in various investment instruments, when in fact he had never made any such investments and had already converted her funds for his own or third party purposes, Attorney Carter violated SCR 20:8.4(c).

---

c. a statement of the balance of the client's funds in the lawyer trust account after the withdrawal.

[6] SCR 20:1.15(b)(1) provides:

A lawyer shall hold in trust, separate from the lawyer's own property, that property of clients and 3rd parties that is in the lawyer's possession in connection with a representation.   All funds of clients and 3rd parties paid to a lawyer or law firm in connection with a representation shall be deposited in one or more identifiable trust accounts.

[7] SCR 20:8.4(c) provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

- Count 7: By failing to respond to N.N.'s requests for a billing statement, Attorney Carter violated SCR 20:1.5(b)(3).[8]

¶14 During the course of the OLR's investigation into N.N.'s grievance, the OLR requested Attorney Carter's 2009 trust account records. The OLR's review of the records revealed deficiencies that led to the following four counts of misconduct, to which Attorney Carter also pled no contest:

- Count 8: In September 2009, Attorney Carter made an unidentified deposit to his trust account by telephone transfer in the amount of $2,500. Carter was unable to identify to the OLR the reason for this transfer, but his business account bank statements confirm the funds came from him. By making this telephone transfer to his trust account, Attorney Carter violated SCR 20:1.15(e)(4)b.[9]

---

[8] SCR 20:1.5(b)(3) provides, "A lawyer shall promptly respond to a client's request for information concerning fees and expenses."

[9] SCR 20:1.15(e)(4)b. provides:

No deposits or disbursements shall be made to or from a pooled trust account by a telephone transfer of funds. This section does not prohibit any of the following:

1. wire transfers.

2. telephone transfers between non-pooled draft and non-pooled non-draft trust accounts that a lawyer maintains for a particular client.

- Count 9: Another of Attorney Carter's clients, K.S, received $2,000 monthly payments related to K.S.'s sale of a business interest. Attorney Carter represented K.S. with respect to this sale. Rather than depositing the monthly payments in his trust account and then disbursing the funds to K.S. by issuing checks from the trust account, Attorney Carter channeled the funds through his own business account on at least ten occasions, thereby violating SCR 20:1.15(b)(1).

- Count 10: By failing to maintain trust account records showing the required information, including a transaction register, subsidiary client ledgers, deposit records, canceled checks, and monthly account reconciliations, Attorney Carter violated SCR 20:1.15(f)(1).[10]

---

[10] SCR 20:1.15(f)(1) provides:

Complete records of a trust account that is a draft account shall include a transaction register; individual client ledgers for IOLTA accounts and other pooled trust accounts; a ledger for account fees and charges, if law firm funds are held in the account pursuant to sub. (b)(3); deposit records; disbursement records; monthly statements; and reconciliation reports, subject to all of the following:

a. Transaction register. The transaction register shall contain a chronological record of all account transactions, and shall include all of the following:

1. the date, source, and amount of all deposits;

(continued)

9

2. the date, check or transaction number, payee and amount of all disbursements, whether by check, wire transfer, or other means;

3. the date and amount of every other deposit or deduction of whatever nature;

4. the identity of the client for whom funds were deposited or disbursed; and

5. the balance in the account after each transaction.

b. Individual client ledgers. A subsidiary ledger shall be maintained for each client or 3rd party for whom the lawyer receives trust funds that are deposited in an IOLTA account or any other pooled trust account. The lawyer shall record each receipt and disbursement of a client's or 3rd party's funds and the balance following each transaction. A lawyer shall not disburse funds from an IOLTA account or any pooled trust account that would create a negative balance with respect to any individual client or matter.

c. Ledger for account fees and charges. A subsidiary ledger shall be maintained for funds of the lawyer deposited in the trust account to accommodate monthly service charges. Each deposit and expenditure of the lawyer's funds in the account and the balance following each transaction shall be identified in the ledger.

d. Deposit records. Deposit slips shall identify the name of the lawyer or law firm, and the name of the account. The deposit slip shall identify the amount of each deposit item, the client or matter associated with each deposit item, and the date of the deposit. The lawyer shall maintain a copy or duplicate of each deposit slip. All deposits shall be made intact. No cash, or other form of disbursement, shall be deducted from a deposit. Deposits of wired funds shall be documented in the account's monthly statement.

e. Disbursement records.

(continued)

1. Checks. Checks shall be pre-printed and pre-numbered. The name and address of the lawyer or law firm, and the name of the account shall be printed in the upper left corner of the check. Trust account checks shall include the words "Client Account," or "Trust Account" or words of similar import in the account name. Each check disbursed from the trust account shall identify the client matter and the reason for the disbursement on the memo line.

2. Canceled checks. Canceled checks shall be obtained from the financial institution. Imaged checks may be substituted for canceled checks.

3. Imaged checks. Imaged checks shall be acceptable if they provide both the front and reverse of the check and comply with the requirements of this paragraph. The information contained on the reverse side of the imaged checks shall include any endorsement signatures or stamps, account numbers, and transaction dates that appear on the original. Imaged checks shall be of sufficient size to be readable without magnification and as close as possible to the size of the original check.

4. Wire transfers. Wire transfers shall be documented by a written withdrawal authorization or other documentation, such as a monthly statement of the account that indicates the date of the transfer, the payee, and the amount.

f. Monthly statement. The monthly statement provided to the lawyer or law firm by the financial institution shall identify the name and address of the lawyer or law firm and the name of the account.

g. Reconciliation reports. For each trust account, the lawyer shall prepare and retain a printed reconciliation report on a regular and periodic basis not less frequently than every 30 days. Each reconciliation report shall show all of the following balances and verify that they are identical:

1. the balance that appears in the transaction register as of the reporting date;

(continued)

- Count 11:   By issuing numerous trust account checks without including the client matter and purpose of such checks on the memo line, Attorney Carter violated SCR 20:1.15(f)(1)e.1.

¶15 The referee held a one-day hearing on sanctions. Several witnesses testified as to Attorney Carter's good character and reputation, as well as his long-time community involvement.  Attorney Carter also testified.  He admitted that he used funds from N.N.'s legal matter as a way to relieve significant financial pressures caused by a failed business investment.  He admitted that he erred in managing his trust account.  He admitted that his trust account records reflect that he converted to himself at least $32,400 of N.N.'s funds and converted for third party purposes approximately $39,600 of N.N.'s funds.  He admitted that his claim that he had invested N.N.'s funds was a lie.

¶16  In her report, the referee recommended a three-year suspension of Attorney Carter's license.  The referee wrote that Attorney Carter's misconduct ranged from trust account

---

2. the total of all subsidiary ledger balances for IOLTA accounts and other pooled trust accounts, determined by listing and totaling the balances in the individual client ledgers and the ledger for account fees and charges, as of the reporting date; and

3. the adjusted balance, determined by adding outstanding deposits and other credits to the balance in the financial institution's monthly statement and subtracting outstanding checks and other deductions from the balance in the monthly statement.

recordkeeping violations "to the most fundamental betrayals of the attorney-client relationship"——conversion of client trust funds. The referee noted that Attorney Carter covered up his conversion of N.N.'s funds by perpetuating a "phony story about his investment of those funds," and that "[o]nce exposed, Carter proceeded to hold hostage the distribution of [N.N.'s] trust funds until Carter and [N.N.] reached an agreement as to the amount and payment of Carter's attorney's fees." The referee noted that Attorney Carter "perpetuated his investment charade to OLR for months" before ultimately acknowledging that he never invested N.N.'s funds. The referee also found as an aggravating factor Attorney Carter's lengthy legal experience, particularly in matters of ethics and professional conduct. (Attorney Carter served on the Milwaukee County Ethics Board for 28 years; on a committee for the Board of Attorneys Professional Responsibility for 20 years; and as a special investigator for the OLR for four years.) As mitigating factors, the referee noted that Attorney Carter ultimately pled no contest to all of the charged misconduct; owes no restitution; enjoys a very positive reputation in the Milwaukee area; suffers from blindness as a result of an injury incurred many years ago while on duty as a police officer; and has expressed genuine remorse for his actions.

¶17 There is no claim that any of the referee's findings of fact are clearly erroneous. Accordingly, we adopt them. See In re Disciplinary Proceedings Against Eisenberg, 2004 WI 14, ¶5, 269 Wis. 2d 43, 675 N.W.2d 747.

13

¶18 The only issue on appeal is whether the recommended discipline is appropriate. The court may impose whatever discipline it sees fit, regardless of the referee's recommendation. See In re Disciplinary Proceedings Against Widule, 2003 WI 34, ¶44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶19 Attorney Carter asks for either a public reprimand or, at most, a suspension of less than six months. Attorney Carter claims that his misconduct, while admittedly significant, caused N.N. no monetary loss. He claims there is virtually no risk that he would repeat his misconduct given his personal history, his age, his acceptance of responsibility, and his remorse for his misconduct. He further claims that, given his solid reputation, a reprimand or short suspension will be enough to deter other lawyers from similar misconduct.

¶20 We disagree. By any measure, and by Attorney Carter's own admission, Attorney Carter engaged in very serious misconduct. As we have previously explained:

Misappropriation or conversion of client funds held in trust is one of the most serious acts of lawyer misconduct. It violates the fundamental principle of the lawyer-client relationship——the trust the client places in the lawyer and upon which the lawyer depends to properly represent the client. Further, it places the lawyer's personal pecuniary interest above the client's interests, which the lawyer has undertaken to protect and promote, and it does so at the client's expense. Accordingly, such misconduct should warrant the imposition of the most severe discipline——the license revocation.

In re Disciplinary Proceedings Against Bult, 142 Wis. 2d 885, 890, 419 N.W.2d 245 (1988).

14

¶21 Nonetheless, we have cautioned that "license revocation ought not be imposed indiscriminately in every case of misappropriation or conversion of client funds, as there are other factors to consider and no two disciplinary cases present precisely the same circumstances." Id. at 890-91.

¶22 Thus, the question before the court is whether this case presents sufficient mitigating circumstances to merit a sanction short of revocation. It is a close call.

¶23 There are many aggravating factors. Attorney Carter's conduct involved much more than simple negligence. His conduct was reckless and highly unprofessional. In answer to N.N.'s repeated requests for her funds——over $70,000 of which he had converted——Attorney Carter wove elaborate stories of investment instruments in which he had supposedly placed her money. These supposed investments were pure fiction. Not long after N.N. objected to Attorney Carter's supposed investment scheme, Attorney Carter took action to create leverage over N.N.: he sent her a $43,400 legal bill. He refused to release the remainder of N.N's funds in trust until they reached an agreement on his fees. He accused N.N. of trying to take advantage of him by not insisting that he prepare a written fee agreement listing his hourly rate. These forms of deception and subterfuge are highly damaging to the public's confidence in the integrity and trustworthiness of the bar.

¶24 There are mitigating factors as well. Attorney Carter has had no previous disciplinary troubles over the course of his long legal career. He has earned a solid reputation among his

15

peers and in the community. It appears he repaid most, and perhaps all, of the money he misappropriated from N.N. (The record is unclear as to whether he ever accounted for the $5,000 fee payment he withdrew from his trust account without N.N.'s knowledge.) He has admitted his wrongdoing, pled no contest to all 11 counts of misconduct, and expressed shame and remorse.

¶25 On balance, we find that there are sufficient mitigating circumstances to call for a sanction short of revocation. We agree with the referee's recommendation of a three-year suspension. We find In re Disciplinary Proceedings Against Goldstein, 2010 WI 26, 323 Wis. 2d 706, 782 N.W.2d 388 instructive. There, a lawyer received a two-year suspension for misconduct that included converting nearly $70,000 from three probate estates for which the attorney served as special administrator or personal representative. This court noted that although it will "not hesitate to impose revocation when needed and many cases involving conversion of funds have warranted revocation," a two-year suspension was sufficient given the lawyer's lack of prior discipline over a long legal career, his acknowledgement of his wrongdoing, and his repayment of the converted funds to his clients. Id., ¶¶28-29. We agree with the referee's assessment that a suspension longer than the two-year suspension imposed in Goldstein is appropriate here in light of Attorney Carter's "elaborate scheme specifically employed to avoid his client's demands for distributions of her trust funds," as well as the fact that he "[held] hostage the

16

distribution of her trust funds until he was successful at obtaining his attorney's fees."

¶26 We pause to remark briefly on Attorney Carter's claim that at his age (he was born in 1943), a three-year suspension——which will require him to petition this court for reinstatement under SCR 22.28(3)——might effectively end his career. Attorney Carter generally maintains that it is sad for an otherwise untarnished career to potentially end this way. We agree with this sentiment: this is an unfortunate case involving anomalous behavior from an otherwise ethical lawyer, and we do not relish deciding it. But we decline to transform this sentiment into anything more than what it is——a sentiment, not a principle of law. This court cannot countenance a rule that would soft-pedal the discipline owed to attorneys who lie to and misappropriate funds from their clients so long as they do so in the twilight of their careers.

¶27 No restitution was sought and none is ordered in this proceeding. We note, however, that any attorney petitioning for reinstatement from a disciplinary suspension of six months or more is required to allege and demonstrate that the attorney "has made restitution to or settled all claims of persons injured or harmed by [the attorney's] misconduct . . . or, if not, the [attorney's] explanation of the failure or inability to do so." SCR 22.29(4m).

¶28 We agree with the referee's recommendation that Attorney Carter be required to pay the costs of this proceeding, which total $6,680.62 as of September 24, 2014.

17

¶29 IT IS ORDERED that the license of John J. Carter to practice law in Wisconsin is suspended for a period of three years, effective January 11, 2015.

¶30 IT IS FURTHER ORDERED that within 60 days of the date of this order, John J. Carter shall pay to the Office of Lawyer Regulation the costs of this disciplinary proceeding.

¶31 IT IS FURTHER ORDERED that John J. Carter shall comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.

¶32 IT IS FURTHER ORDERED that compliance with all conditions of this order is required for reinstatement. See SCR 22.29(4)(c).

¶33 DAVID T. PROSSER, J., and PATIENCE DRAKE ROGGENSACK, J., did not participate.