# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE No.: | 2015AP463-D |
| COMPLETE TITLE: | In the Matter of Disciplinary Proceedings Against Christopher E. Meisel, Attorney at Law:<br><br>Office of Lawyer Regulation,<br>       Complainant-Respondent,<br>   v.<br>Christopher E. Meisel,<br>       Respondent-Appellant. |

DISCIPLINARY PROCEEDINGS AGAINST MEISEL

| | |
|---|---|
| OPINION FILED: | April 26, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 11, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | |
|   COUNTY: | |
|   JUDGE: | |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | |
|   DISSENTED: | ABRAHAMSON, J. dissents (opinion filed). |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the respondent-appellant there were briefs filed by *Terry E. Johnson* and *Peterson, Johnson & Murray, S.C.*, Milwaukee, and oral argument by *Terry E. Johnson*.

For the Office of Lawyer Regulation a brief was filed by *Matthew J. Price* and *Foley & Lardner LLP*, Milwaukee, and oral argument by *Matthew J. Price*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2015AP463-D

STATE OF WISCONSIN : IN SUPREME COURT

**In the Matter of Disciplinary Proceedings Against Christopher E. Meisel, Attorney at Law:**

**Office of Lawyer Regulation,**

      **Complainant-Respondent,**

      **v.**

**Christopher E. Meisel,**

      **Respondent-Appellant.**

**FILED**

**APR 26, 2017**

Diane M. Fremgen
Clerk of Supreme Court

ATTORNEY disciplinary proceeding. *Attorney's license suspended.*

¶1 PER CURIAM. Attorney Christopher E. Meisel has appealed Referee Hannah Dugan's recommendation that his license to practice law in Wisconsin be suspended for two years for 15 counts of misconduct, which included converting approximately $175,000 from two estates and two guardianship proceedings. Attorney Meisel stipulated to all counts of misconduct but asserts that, rather than a two-year suspension, a five-month suspension of his law license is an adequate sanction.

¶2 Upon careful review of this matter, we uphold the referee's findings of fact and conclusions of law. We conclude, however, that rather than a two-year suspension, Attorney Meisel's license to practice law should be suspended for 18 months. We further agree with the referee that Attorney Meisel should be required to pay the full costs of this proceeding, which are $10,831.67 as of February 7, 2017. Although the referee recommended that various conditions be imposed upon Attorney Meisel, we find that the imposition of conditions would be better addressed in a future reinstatement proceeding.

¶3 Attorney Meisel was admitted to practice law in Wisconsin in 1994. He has no prior disciplinary history. In October of 2006, Attorney Meisel was diagnosed with brain cancer and days later underwent brain surgery to remove a tumor. Following surgery, he received chemotherapy and radiation treatments, which treatments continued until 2008. Although his condition is currently stable, Attorney Meisel will require constant monitoring. He is not able to work long hours. While prior to his brain surgery he was earning over $100,000 per year, in recent years he has earned approximately $45,000 per year.

¶4 In 2008 Attorney Meisel and his wife decided to pursue international adoption of two children from Guatemala. One of the children was later diagnosed with a number of medical issues, including significant brain formation issues, legal blindness, and learning disabilities. In order to provide that child with the resources she needed, the family moved from the

2

school district in which they were living to a different school district that they believed had better resources to educate the child. The purchase price of the home in the new school district was $125,000 more than the price of the house the family sold.

¶5 In addition to his personal health problems and the medical issues of his daughter, Attorney Meisel was also under financial distress due to a real estate business called King Park Investment Company, LLC, (King Park), which he owned with another man. King Park is a real estate venture in the Marquette University area in Milwaukee.

¶6 The Office of Lawyer Regulation (OLR) filed its 15 count complaint against Attorney Meisel on March 10, 2015. Counts one through three of the complaint arose out of Attorney Meisel's handling of the estate of B.T., who died in October 2008. Attorney Meisel was retained to handle the estate and pursue a potential wrongful death claim. In June 2009, he filed a petition for special administration of the estate in Milwaukee County Circuit Court. Following a settlement of the wrongful death claim, in March 2011 Attorney Meisel filed a petition for formal administration of the estate. The OLR's complaint alleged that Attorney Meisel disbursed numerous checks from his trust account for the benefit of King Park from funds belonging to the estate.

¶7 The specific counts of misconduct alleged in the complaint arising out of B.T.'s estate were as follows:

3

**Count 1:** By failing to hold $50,003.29 in trust belonging to the Estate of B.T., Attorney Meisel violated SCR 20:1.15(b)(1).[1]

**Count 2:** By converting to his own purposes $50,003.29 in trust funds belonging to the estate of B.T., Attorney Meisel violated SCR 20:8.4(c).[2]

**Count 3:** By depositing $47,244.20 in personal and law firm funds into his trust account in April 2012, to replace the bulk of the funds that he had converted from the B.T. Estate, Attorney Meisel violated SCR 20:1.15(b)(3).[3]

¶8 Counts 4 through 14 of the OLR's complaint arose out of Attorney Meisel's appointment as guardian of the estates of D.C. and Y.M., step-sisters whose parents died in an automobile accident in February of 2006. D.C. was five years at the time

---

[1] Effective July 1, 2016, substantial changes were made to Supreme Court Rule 20:1.15, the "trust account rule." See S. Ct. Order 14-07, (issued Apr. 4, 2016, eff. July 1, 2016). Because the conduct underlying this case arose prior to July 1, 2016, unless otherwise indicated, all references to the supreme court rules will be to those in effect prior to July 1, 2016.

SCR 20:1.15(b)(1) provides:

A lawyer shall hold in trust, separate from the lawyer's own property, that property of clients and 3rd parties that is in the lawyer's possession in connection with a representation. All funds of clients and 3rd parties paid to a lawyer or law firm in connection with a representation shall be deposited in one or more identifiable trust accounts.

[2] SCR 20:8.4(c) provides: "It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

[3] SCR 20:1.15(b)(3) provides: "No funds belonging to the lawyer or law firm, except funds reasonably sufficient to pay monthly account service charges, may be deposited or retained in a trust account."

of the accident, and Y.M. was close to one year old. A Milwaukee County probate court commissioner appointed Attorney Meisel as guardian of the girls' estates in October 2007. Attorney Meisel established separate guardianship accounts for the children.

¶9 Pursuant to Wis. Stat. § 54.62, a guardian is required to file with the court an annual accounting for a guardianship prior to April 15 of the following year. Amy Wochos, legal counsel and senior administrator for the Milwaukee County Clerk of Circuit Court, testified at the evidentiary hearing before the referee that she oversees filings in probate court. She testified that in 2013 she became aware that an order to show cause had been issued against Attorney Meisel by the probate court because he had failed to file the annual accountings for the children's guardianship.

¶10 Ms. Wochos testified that in early 2014 Attorney Meisel came to the probate office and asked to speak with her. She said Attorney Meisel indicated he had taken money from the minor guardianship accounts, that he had self-reported this behavior to the OLR, and that he had either put the money back or was in the process of putting it back and understood he needed to be relieved of his duties as guardian for the girls. Attorney Meisel converted money from the estate of J.D. to replace the funds he took from the guardianship accounts.

¶11 OLR's complaint alleged the following counts of misconduct with respect to the two guardianship proceedings and the second estate proceeding:

5

**Count 4:** By failing to hold as much as $21,000 in the D.C. Account at times between March 2009 and November 2012, Attorney Meisel violated SCR 20:1.15(j)(1).[4]

**Count 5:** By converting and re-converting D.C. Guardianship funds to his own purposes between March 2009 and March 2012, Attorney Meisel violated SCR 20:8.4(c).

**Count 6:** By depositing into the D.C. Account $57,800.61 in King Park funds and funds converted from his trust account and the Estate of J.D., Attorney Meisel violated SCR 20:1.15(j)(1).

**Count 7:** By depositing into the D.C. Account $57,800.61 in King Park funds and funds converted from his trust account and the Estate of J.D., thereby concealing his conversion and re-conversion of funds belonging to D.C., Attorney Meisel violated SCR 20:8.4(c).

**Count 8:** By failing to hold as much as $21,455.25 in the Y.M. Account between March 2009 and November 2012, Attorney Meisel violated SCR 20:1.15(j)(1).

**Count 9:** By converting and re-converting Y.M. Guardianship funds to his own purposes between March 2009 and March 2012, Attorney Meisel violated SCR 20:8.4(c).

**Count 10:** By depositing into the Y.M. Account $70,056.12 in King Park funds and funds converted from his trust account and the Estate of J.D., Attorney Meisel violated SCR 20:1.15(j)(1).

---

[4] SCR 20:1.15(j)(1) provides:

A lawyer shall hold in trust, separate from the lawyer's own funds or property, those funds or that property of clients or 3rd parties that are in the lawyer's possession when acting in a fiduciary capacity that directly arises in the course of, or as a result of, a lawyer-client relationship or by appointment of a court.

**Count 11:** By depositing into the Y.M. Account $70,056.12 in King Park funds and funds converted from his trust account and the Estate of J.D., thereby concealing his conversion and re-conversion of funds belonging to Y.M., Attorney Meisel violated SCR 20:8.4(c),

**Count 12:** By filing annual accountings with the Milwaukee County Probate Court for the D.C. and Y.M. Guardianships, which failed to disclose the disbursements that he made from those guardianships and included documentation of account balances that had been deliberately, and temporarily, inflated to document the required balances and conceal his conversions, Attorney Meisel violated SCR 20:3.3(a)(1).[5]

**Count 13:** By failing to hold as much as $31,201.48 in the fiduciary account for the Estate of J.D., Attorney Meisel violated SCR 20:1.15(j)(1).

**Count 14:** By converting to his own purposes as much as $31,201.48 in the fiduciary account for the Estate of J.D., Attorney Meisel violated SCR 20:8.4(c).

¶12 Count 15 of the OLR's complaint alleged:

**Count 15:** By failing to maintain a transaction register and client ledgers with running balances, and by failing to perform monthly reconciliations of his trust account, thereby failing to maintain complete records of a trust account, Attorney Meisel violated SCR 20:1.15(f)(1)a., (f)(1)b., and f(i)g.[6]

---

[5] SCR 20:3.3(a)(1) provides: "A lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."

[6] SCR 20:1.15(f)(1)a provides:

The transaction register shall contain a chronological record of all account transactions, and shall include all of the following:

(continued)

1. the date, source, and amount of all deposits;

2. the date, check or transaction number, payee and amount of all disbursements, whether by check, wire transfer, or other means;

3. the date and amount of every other deposit or deduction of whatever nature;

4. the identity of the client for whom funds were deposited or disbursed; and

5. the balance in the account after each transaction.

Section 20:1.15(f)(1)b provides:

A subsidiary ledger shall be maintained for each client or 3rd party for whom the lawyer receives trust funds that are deposited in an IOLTA account or any other pooled trust account. The lawyer shall record each receipt and disbursement of a client's or 3rd party's funds and the balance following each transaction. A lawyer shall not disburse funds from an IOLTA account or any pooled trust account that would create a negative balance with respect to any individual client or matter.

. . .

Section 20:1.15(f)(1)g provides:

For each trust account, the lawyer shall prepare and retain a printed reconciliation report on a regular and periodic basis not less frequently than every 30 days. Each reconciliation report shall show all of the following balances and verify that they are identical:

1. the balance that appears in the transaction register as of the reporting date;

2. the total of all subsidiary ledger balances for IOLTA accounts and other pooled trust accounts, determined by listing and totaling the balances in the

(continued)

¶13 Attorney Meisel filed an answer to the complaint in April 2015. In December of 2015, Attorney Meisel and the OLR entered into a stipulation whereby Attorney Meisel withdrew his answer to the complaint and pled no contest to each allegation of misconduct set forth in the complaint. The parties agreed that the complaint could serve as the factual basis for the referee's determination of misconduct and the referee's recommendation as to discipline. The parties further agreed that the evidentiary hearing would be limited to taking additional evidence and argument to facilitate the referee's recommendation to this court as to the appropriate amount of discipline. The OLR's complaint had sought a three-year suspension of Attorney Meisel's law license.

¶14 The evidentiary hearing took place on January 25, 2016. In addition to Amy Wochos, Heather Coning, an insurance and bonding agent, and Attorney Meisel testified in person. Dr. Mark G. Malkin testified by telephone.

¶15 Attorney Meisel testified that if he were to lose his license to practice law for two or three years, he did not believe he would ever be able to return to the practice of law.

---

individual client ledgers and the ledger for account fees and charges, as of the reporting date; and

3. the adjusted balance, determined by adding outstanding deposits and other credits to the balance in the financial institution's monthly statement and subtracting outstanding checks and other deductions from the balance in the monthly statement.

When asked by the referee about his conversion of the funds, Attorney Meisel said:

> I did it. It was wrong. The whole world was in a fog. I know I did it – it was wrong. I was bonded at all times. I'm not making a justification for it, but I didn't think it would come to a problem. . . .
>
> I knew I did it. I have never denied that. Why? It's hard to say. I was juggling so many things that I just did it without really thinking, you know. I just figured that money would be coming in or – I don't know. It was dumb.

¶16 Dr. Malkin's December 31, 2015, letter/report to Attorney Terry E. Johnson, Attorney Meisel's counsel in this matter, was received into evidence at the hearing. The letter indicates that Dr. Malkin was Attorney Meisel's attending neuro-oncologist from November 2006 through August 2013, at which time Dr. Malkin relocated from Milwaukee to Richmond, Virginia. Dr. Malkin's report explains Attorney Meisel's medical history. Dr. Malkin said:

> I am aware, from conversations with Mr. Meisel's attorneys, of some of the circumstances surrounding the fiscal decisions Mr. Meisel made which have resulted in the disciplinary proceedings brought against him. I am aware that he missed time from work which would have left him with less time and more stress to complete the work which he had taken on. I am aware that he turned away clients because he could not keep up with the case load to which he had been accustomed before he became ill. I am aware that his practice declined, adding financial burden and stress. I am aware that certain real-estate investments were devalued, and that he fell out with his partner, adding further stress. I am aware that he did not share these concerns at work with his wife, and he certainly didn't with me. I am aware that he was not willing to seek professional help to manage distress. Under these circumstances anybody would have been

10

overwhelmed, and certainly Mr. Meisel was especially susceptible to making errors in judgment as a maladaptive strategy to deal with the multiple stressors, given his medical history, the medications he was on, and the permanent damage to his brain from the tumor and treatment thereof. It was a 'perfect storm'. . . .

All of us are subject to stress, and much of this stress is external and beyond our control. Mr. Meisel is no different. However, his brain tumor and the treatment thereof created brain damage that predisposed him to inappropriate, non-constructive cognitive responses to stress. I cared for Mr. Meisel for almost seven years, and therefore I believe I know him quite well. I believe the behavior that led to the inappropriate fiscal decisions that he made was an aberration and not likely to repeat itself. That said, it is my recommendation that he undergo a comprehensive neuropsychological evaluation, . . .. I recommend that he receive formal psychotherapy to help him manage stress in a constructive way, . . .. Finally, I recommend that Mr. Meisel continue to be followed on a scheduled basis by a neuro-oncologist with MRI scans of the brain to monitor his brain tumor status, . . ..

¶17 In his telephone testimony at the evidentiary hearing, Dr. Malkin said:

Well, I would sum it up by saying that we have a situation here where, beyond the usual stressors in anyone's life, Mr. Meisel was affected by a potentially fatal brain tumor, which necessitated surgery to remove the tumor and part of the surrounding brain, radiation therapy, which affected the brain volume and function, chemotherapy, and other medications to control symptoms of the brain tumor, like seizures, and the stressors, like anxiety and depression, are associated with this diagnosis and treatment, all of which conspired to create a perfect storm such that his injured brain, under extreme stress, has reacted to a situation, his judgment was affected, and he made a financial decision which I'm sure he regrets.

11

¶18 When asked by Attorney Meisel's counsel whether those opinions were held to be true to a reasonable degree of medical probability, Dr. Malkin answered in the affirmative.

¶19 On cross-examination by the OLR's counsel, the following exchange occurred:

Q: Can you state to a reasonable degree of medical probability that Mr. Meisel's medical conditions relating to the brain tumor caused him to repeatedly convert trust funds, and reconvert trust funds, over a three-year period?

A: Yes

Q: And what's the basis for that conclusion?

A: The basis is that the damage we are looking at on the MRI scan of 2011 is permanent damage. It's never going to change. It will always look at least that bad. It's a static problem, not one that evolved overnight nor one that is ever going to get better.

So it stands to reason that this impaired brain will be susceptible, or predisposed, as I wrote, to making the same error in judgment, or memory, or executive function over and over again.

Q: But being predisposed to doing something is different than causing it to happen, right? They're not necessarily the same thing, you testified to?

A: Correct.

Q: Okay. So not everyone who is predisposed to alcoholism, for example, becomes an alcoholic, correct?

A: That's correct.

Q: So on one hand in your report we talked about the predisposed section, and you testified in response to Mr. Johnson's question that the – the damage is permanent, it's not going to change, but then in the last paragraph of your report, the – the fourth sentence of the last paragraph on your report you

12

state, 'I believe the behavior that led to the inappropriate fiscal decisions that he made was aberration and not likely to repeat itself.' Did you put that statement in your report?

A: Yes, I did.

Q: So how can you on one hand tell us that he's predisposed to engaging in these activities, and has engaged in these activities, the damage is permanent, and things are not likely to improve, yet in the next paragraph you're telling us presumably what you believe to a medical – high degree of medical probability, that he's not likely to re-engage in the same conduct? How do you reconcile that?

A: The reconciliation is based upon the fact that Mr. Meisel is not under anywhere near the kind of stress that he was under when these events occurred. His tumor is in remission. It is not impossible that it won't come back, but it is unlikely. That's number one.

As his attorney has just told all of us, his financial situation is more stable, his child situation is more stable. These are important stressors which were in effect at the time but no longer operable.

And at the time, despite this predisposition, Mr. Meisel did not avail himself of the kind of support and professional help that might have prevented him, given this predisposition, from acting in the way he did.

Now, if Mr. Meisel didn't do anything about his stress, and ignored recommendations to find constructive ways to manage stress, then I would say there would be a concern that it could happen in the future.

But I think the circumstances of his life now are very different than they were then. And – and that's how I would reconcile the two paragraphs.

Q: But as I understand it, your position that it's not likely to recur, the behavior – the inappropriate behavior is not going to recur, is largely based upon the reduction of stress in Mr. Meisel's life, correct?

13

A: That is correct.

Q: But –

A: I don't think we should underestimate the importance of that. I really don't.

Q: Okay. Accepting that, wouldn't the opposite then be true, that if the stress – if the high level of stress returned to his life, we should reasonably expect that he's predisposed to commit the same misconduct that he did previously?

A: We should be concerned about that risk and do what can be done to prevent that. And that is why I recommend the neuropsych evaluation, to better understand it, and to objectify it, and the psychotherapy intervention.

Because the stress that comes into our lives is not always under our control. Sometimes we bring it upon ourselves, but more often than not it's an external thing. And that needs to be managed. That's the missing link in Mr. Meisel's care.

¶20 The parties filed post-hearing briefs regarding the appropriate sanction. The referee filed her report and recommendation on July 15, 2016. The referee said Attorney Meisel's violations of supreme court rules were made more egregious because 11 counts involved the guardianship of funds of orphaned children. The referee also said the three counts related to the B.T. estate reflected a serious breach of trust to the estate beneficiaries and to the court. The referee acknowledged:

The confluence of personal and medical matters Attorney Meisel faced beginning in 2006 were substantial, life-changing. The long term cognitive effects of the brain cancer and treatments are balanced sympathetically in favor of Attorney Meisel, for misconduct that would otherwise call for a much greater sanction, especially because the actual

14

misconduct did not occur until he returned to active practice a couple of years later.

The misconduct related to sustaining the King Park project is not viewed as sympathetically; options in handling the business partnership were available and the nature of that business deal is not so compelling as to warrant much mitigation for substantial misconduct involving substantial conversions. Additionally, it cannot go without note that Attorney Meisel presented his defenses regarding his misconduct in matters he handled which affected only these four vulnerable people and estates; even while during the same time period he carried forth on other client matters without engaging in similar misconduct.

¶21 As part of her report, the referee discussed in detail the American Bar Association's standards for imposing lawyer sanctions. With respect to aggravating factors, the referee found that Attorney Meisel demonstrated a dishonest or selfish motive since he used converted client funds for his own personal benefit. The referee also found a pattern of misconduct in that Attorney Meisel's repeated conversions and unreported replenishments of the money occurred over a three-year period, involved four separate matters – two vulnerable wards and two estates over which he had exclusive control – and eventually were determined to total more than $175,000. The referee noted that Attorney Meisel's conduct involved multiple offenses. She said that Attorney Meisel had substantial experience in the practice of law, having practiced for almost 15 years when he first converted funds.

¶22 The referee also found a number of mitigating factors, including Attorney Meisel's lack of a prior disciplinary record; his significant personal and emotional problems; the fact that

15

he made full restitution to the clients from which he converted funds; the fact that he was cooperative during the OLR proceedings and eventually entered into a stipulation; and the fact that he expressed remorse for his misconduct.

¶23 Although the OLR included physical and mental disability in its list of mitigating factors, the referee found that the record did not support placing much weight on those factors as mitigating the misconduct. In the referee's opinion, Attorney Meisel did not provide clear, satisfactory, and convincing evidence of the nexus between his medical condition and the repeated proactive misconduct of converting client funds that occurred over the course of several years.

¶24 The referee went on to say that although the record supported the finding that Attorney Meisel had and has mental health conditions, the record did not establish that those conditions were mental disabilities. The referee noted that Dr. Malkin ultimately testified that Attorney Meisel's health condition may have <u>predisposed</u> him to less acute judgment and executive function, but Dr. Malkin acknowledged that predisposition is not the same as causation. Accordingly, the referee concluded that Dr. Malkin did not satisfactorily draw the required causal connection between Attorney Meisel's health issues and his misconduct. The referee noted that in <u>In re Disciplinary Proceedings Against Sosnay</u>, 209 Wis. 2d 241, 243, 562 N.W.2d 137 (1997), this court said that absent a causal connection between an attorney's medical condition and the attorney's professional misconduct, the medical condition may

16

not be considered a factor mitigating either the seriousness of the misconduct or the severity of the discipline to be imposed for it.

¶25 The referee also noted that even when an attorney has been able to establish a direct causal connection between a medical condition and professional misconduct, the fact that the attorney was apparently able to serve other clients free of misconduct, as the record shows Attorney Meisel was able to do, was significant in determining the sanction and the mitigating effects of medical conditions. See In re Disciplinary Proceedings Against Jacobson, 2004 WI 152, ¶79, 277 Wis. 2d 120, 690 N.W.2d 264; In re Disciplinary Proceedings Against Karlsson, 2001 WI 126, ¶48, 248 Wis. 2d 681, 635 N.W.2d 771.

¶26 Due to the lack of a causal connection between the medical condition and the misconduct, the referee found that Attorney Meisel failed to present persuasive arguments that would support a five-month suspension. The referee concluded that a two-year suspension of Attorney Meisel's license to practice law was an appropriate sanction. In support of this recommendation, the referee cited In re Disciplinary Proceedings Against Edgar, 230 Wis. 2d 205, 601 N.W.2d 284 (1999); In re Disciplinary Proceedings Against Edgar (Edgar II), 2003 WI 49, 261 Wis. 2d 413, 661 N.W.2d 817; In re Disciplinary Proceedings Against Brown, 2012 WI 51, 340 Wis. 2d 527, 814 N.W.2d 172; and In re Disciplinary Proceedings Against Carter, 2014 WI 126, 359 Wis. 2d 70, 856 N.W.2d 595.

17

¶27 The referee noted that the law licenses of Brown and Edgar were suspended for two years, and Carter's license was suspended for three years.  All three cases involved conversion of funds and comingling of trust and personal funds to pay personal expenses.  The amounts of the conversions in those cases were significantly less than at issue here, with the Edgar case involving about $11,000, Brown $13,000, and Carter $75,000.  The referee noted that as in Carter, Attorney Meisel entered into a stipulation to resolve the matter.  She also noted that Attorney Meisel has made restitution and returned the converted funds.

¶28 In addition to concluding that a two-year suspension, was appropriate, the referee also recommended the imposition of the following conditions upon Attorney Meisel:

(1) demonstration that he has his medical conditions and stress and any other emotional or psychological problems under control, by his submission of documentation of fitness pursuant to a medical examination by a health provider approved by the OLR, at his own expense;

(2) that he remain in treatment as recommended by his treating physician and obtain evaluations and neuro-oncologist monitoring pursuant to the written medical report included in the record as Exhibit 117 and via trial testimony, and that his medical treatment be monitored by the OLR via submission of quarterly reports for a period of two years following his reinstatement;

(3) that his practice of law be monitored by an attorney approved by OLR for a period of two years following reinstatement, unless he is either employed by a law firm, corporate office or practicing with another attorney aware of his disciplinary and medical history;

(4) that he obtain six Continuing Legal Education credits in trust account and/or law office management, and six Continuing Legal Education credits in business and professional conflict of interest, to be approved by OLR and monitored by OLR for compliance.

¶29 Attorney Meisel's appeal raises three issues:

1. Did Attorney Meisel present clear, convincing, and satisfactory evidence of a causal connection between Attorney Meisel's medical condition and his misconduct?

2. Did the aggravating factors of Attorney Meisel's conduct weigh more heavily than the mitigating factors?

3. Is a two-year suspension disproportionate for the alleged offenses?

¶30 Attorney Meisel argues that his testimony at the evidentiary hearing, combined with the testimony of Dr. Malkin, presented clear, convincing and satisfactory evidence that Attorney Meisel's medical condition caused him to engage in the misconduct. He argues that the referee erroneously found otherwise.

¶31 Attorney Meisel further argues that the referee's finding that the aggravating factors in this case weigh more heavily than the mitigating factors is not supported either by the record or by applicable case law. He asserts there is simply no evidence to support any contention that his actions were made with a selfish motive. He asserts that the mitigating factors in this case far outweigh any aggravating factors and he

19

says the contrary conclusion of the referee is based on mere speculation.

¶32 Attorney Meisel also argues that the referee's recommendation of a two-year suspension is disproportionate to the allegations of misconduct. Attorney Meisel acknowledges that what he did was wrong, but he notes that the actions were taken during a very bad time in his life when he was undergoing very stressful situations involving his health and his family. He says his contrition, his appreciation of the error of his ways, and his understanding of what he needs to do to return to being a productive member of the bar were evident in his testimony at the evidentiary hearing.

¶33 Attorney Meisel acknowledges that one factor the court considers when assessing the appropriate level of discipline to impose is the need to deter other attorneys from engaging in similar misconduct. He says not only are the unique medical, personal, emotional, and financial circumstances that led to the series of terrible, stupid mistakes he made extremely unlikely to ever be repeated by any other attorney, the experience which he has already gone through will strongly motivate him to avoid any such conduct in the future. He asserts that no other attorney is ever going to be placed in the same situation he was and in the extremely unlikely event someone was placed in a similar situation, that attorney's impaired judgment capabilities would not make it possible to fully take into account the circumstances and discipline imposed in this case.

¶34 Attorney Meisel argues that when viewed in its entirety, the appropriate sanction for his misconduct would be a suspension of no more than five months. Attorney Meisel notes that the difference between a five-month suspension and a six-month suspension is significant since, pursuant to SCR 22.28, suspensions of less then six months permit reinstatement upon application and execution of documents indicating compliance with the requirements of the suspension. By contrast, suspensions of six months or more require the attorney to file a petition for reinstatement and go through a full reinstatement proceeding, which can add as much as one to two years on to the suspension.

¶35 Attorney Meisel argues that the decision in Jacobson should guide this court in its analysis of the case. Attorney Jacobson received a five-month suspension for multiple counts of misconduct, which included failure to communicate with clients and keep them informed; trust account discrepancies; misuse of client funds; and misrepresentation to and failure to cooperate with the OLR. The referee in that case found that Attorney Jacobson's ongoing depression was the cause of the misconduct that led to the disciplinary proceedings. A psychiatrist testified at Attorney Jacobson's evidentiary hearing that, to a reasonable degree of medical probability, there was a direct relationship between Attorney Jacobson's depression and his misconduct.

¶36 The OLR argues that Attorney Meisel's egregious misconduct involving conversions in excess of $175,000 over a

21

three-year period warrants a two-year suspension of his license to practice law. According to the OLR, Attorney Meisel's misconduct more closely approaches the standards for revocation, and it says the minimally appropriate discipline in this case should be a very lengthy suspension.

¶37 As to Attorney Meisel's claim that Dr. Malkin established a causal connection between Attorney Meisel's health issues and his misconduct, the OLR says that Dr. Malkin wrote in his expert report and said in testimony at the evidentiary hearing initially consistent with the report, that Attorney Meisel's health condition may have predisposed Attorney Meisel to less acute judgment and executive function. The OLR says Dr. Malkin then dramatically detoured from his report in his hearing testimony and opined that the medical issues actually caused Attorney Meisel's three year pattern of misconduct. The OLR says in attempting to justify that opinion on cross-examination, Dr. Malkin apparently recognized the dearth of any medical basis to support it and promptly retreated to his theory of predisposition, not causation.

¶38 The OLR notes that in her findings of fact, the referee found that Dr. Malkin clarified on cross-examination that his ultimate opinion was that Attorney Meisel was merely predisposed to bad decision making and the doctor did not provide testimony of a causal relationship between the medical condition and the conversions. The OLR asserts the referee's findings of fact are supported by Dr. Malkin's own testimony and should be upheld by this court.

22

¶39 The OLR argues that Attorney Meisel's proposed discipline of a suspension of less than six months would undermine multiple goals of attorney discipline, particularly recognition of the seriousness of the misconduct and the need to deter other attorneys from engaging in similar misconduct. The OLR says the referee appropriately cited the Edgar, Brown, and Carter cases as support for the imposition of a two-year suspension of Attorney Meisel's law license. As to the conditions recommended by the referee, the OLR says they all relate to appropriate reinstatement concerns and the OLR suggests that this court refrain from ordering the conditions as part of the disciplinary case and rather allow the particulars of appropriate treatment and monitoring to be addressed in the context of a future formal reinstatement proceeding.

¶40 A referee's findings of fact are affirmed unless clearly erroneous. Conclusions of law are reviewed de novo. See In re Disciplinary Proceedings Against Eisenberg, 2004 WI 14, ¶5, 269 Wis. 2d 43, 675 N.W.2d 747. The court may impose whatever sanction it sees fit, regardless of the referee's recommendation. See In re Disciplinary Proceedings Against Widule, 2003 WI 34, ¶44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶41 After careful review of the matter, we conclude there has been no showing that any of the referee's findings of fact, including her finding that Dr. Malkin did not provide testimony showing a causal relationship between Attorney Meisel's medical condition and the conversions, are clearly erroneous and, accordingly, we adopt them. We further agree with the referee's

23

conclusions of law that Attorney Meisel violated all of the supreme court rules set forth above.

¶42 Turning to the question of the appropriate sanction, the four primary goals of attorney discipline are to address the seriousness of the misconduct; to protect the public, courts, and the legal system from repetition of misconduct; to impress upon the attorney the seriousness of the misconduct; and to deter other attorneys from engaging in similar misconduct. See In re Disciplinary Proceedings Against Arthur, 2005 WI 40, ¶78, 279 Wis. 2d 583, 694 N.W.2d 910. Both aggravating and mitigating factors may be taken into consideration in determining the appropriate sanction for attorney misconduct.

¶43 We disagree with Attorney Meisel's claim that there is no evidence in the record to support a finding that his actions were made with a selfish motive or to gain advantage. In the referee's words:

> Attorney Meisel used converted client funds for his own personal benefit, including but not limited to sustaining King Park, even though his business partner was not pressuring him to maintain payments. Further, Attorney Meisel camouflaged his conversions replacing converted funds with those converted from other client funds and by mingling personal funds and law firm funds. The timing of the conversions was deliberate and, with respect to the guardianships, often very close to accounting time frames. The actual conversions further demonstrated dishonesty when Attorney Meisel further concealed his misconduct by filing falsified annual accountings with the Milwaukee County Probate Court that intentionally omitted disclosure of the converted and replenished fund transactions.

24

¶44 We find that the record supports the referee's conclusions. We also agree with the referee that Attorney Meisel's repeated conversions and unreported replenishments, which occurred over a three-year period, involved four separate matters, and totaled more than $175,000, evidenced a pattern of misconduct. We also share the referee's concern that Attorney Meisel converted funds from vulnerable victims. All of these are aggravating factors.

¶45 We agree that this case also presents a number of mitigating factors. Specifically, we agree with Attorney Meisel that his medical condition and other personal and financial issues do constitute mitigating factors. We view Dr. Malkin's characterization of the multiple stressors facing Attorney Meisel as being a "perfect storm" as being an apt description of the situation in which Attorney Meisel found himself.

¶46 Although we agree with the referee that Attorney Meisel failed to prove that his medical condition caused his professional misconduct, the referee and the OLR acknowledge that Dr. Malkin opined that the medical condition may have pre-disposed Attorney Meisel to less acute judgment.

¶47 We noted in Sosnay that absent a causal connection between an attorney's psychological condition and professional misconduct the referee properly declined to consider the psychological condition in mitigation either of the seriousness of the misconduct or the severity of the discipline warranted. In the instant case, however, the OLR concedes that Attorney

25

Meisel's serious medical condition should be considered a mitigating factor. In its appellate brief, the OLR said:

> Despite the absence of the required causal connection between Meisel's medical condition and his misconduct . . . OLR does not contest that Meisel's health issues contributed to increased stress on his everyday life.

¶48 In addition, although the referee found the record did not support placing "much weight" on Attorney Meisel's medical issues, she did agree that, "[t]he confluence of personal and medical matters . . . were substantial, life-changing" and the long term effects of Attorney Meisel's medical condition were "balanced sympathetically" in his favor.

¶49 We agree with the OLR and the referee that the unique medical and personal issues facing Attorney Meisel should be considered mitigating factors. We also agree with the OLR and the referee that absent those medical and personal issues a very lengthy suspension, or perhaps even revocation, would be under consideration. Although no two disciplinary proceedings are ever identical, this court does, to the extent possible, endeavor to impose a similar level of discipline in fact situations that are somewhat analogous. In support of his argument that a two-year suspension is excessive, Attorney Meisel notes that in In re Disciplinary Proceedings Against MacLean, 2016 WI 45, 369 Wis. 2d 59, 879 N.W.2d 767, an attorney who intentionally misappropriated over $450,000 received a two-year suspension. Although we find that the clients in this case were more vulnerable than the client in MacLean, the amount of

26

the conversions in this case is less than half of the amount converted in MacLean. After careful consideration of the aggravating and mitigating factors present in this case, we deem it appropriate to impose a lesser suspension in this case than was imposed in MacLean and find it appropriate to impose an 18-month suspension of Attorney Meisel's license to practice law in Wisconsin.

¶50 We agree with the OLR that it would be premature to develop conditions for Attorney Meisel's reinstatement at this juncture. We find that the issue of conditions would be best addressed in the context of a future reinstatement proceeding. Since Attorney Meisel has already made full restitution of all converted funds, no restitution award is sought. As is our general practice, we agree that Attorney Meisel should be required to pay the full costs of this disciplinary proceeding.

¶51 IT IS ORDERED that the license of Christopher E. Meisel to practice law in Wisconsin is suspended for a period of 18 months, effective June 7, 2017.

¶52 IT IS FURTHER ORDERED that Christopher E. Meisel shall comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.

¶53 IT IS FURTHER ORDERED that within 60 days of the date of this order, Christopher E. Meisel pay to the Office of Lawyer Regulation the costs of this proceeding, which are $10,831.67. If the costs are not paid within the time specified, and absent a showing to this court of his inability to pay the costs within

27

that time, the license of Christopher E. Meisel to practice law in Wisconsin, shall remain suspended until further order of the court.

¶54 IT IS FURTHER ORDERED that compliance with all conditions of this order is required for reinstatement. See SCR 22.29(4)(c).

¶55 SHIRLEY S. ABRAHAMSON, J. *(dissenting).* Attorney Meisel has had more than his share of medical problems and has obviously suffered immensely. I could go along with the referee's recommendation of a two-year suspension. The referee already considered mitigating factors. In In re Disciplinary Proceedings Against Sosnay, 209 Wis. 2d 241, 562 N.W.2d 137 (1997), this court said that absent a causal connection between an attorney's medical condition and the attorney's professional misconduct, the medical condition may not be considered a factor mitigating either the seriousness of the misconduct or the severity of the discipline to be imposed for it. The per curiam opinion undermines Sosnay. I am unwilling to do that. What is left of Sosnay? Lawyers, the OLR, and referees ought to know what factors are mitigating factors.